# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CRAIG L. SCHWAB, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br> vs. <br><br> E*TRADE FINANCIAL CORPORATION, E*TRADE SECURITIES LLC, PAUL T. IDZIK, and DAVID HERBERT, <br><br> Defendants. | Case No. 16-cv-5891 <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Craig L. Schwab ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by E*TRADE Financial Corporation ("E*TRADE Financial") and E*TRADE Securities LLC ("E*TRADE Securities," collectively with E*TRADE Financial, "E*TRADE" or the "Company"), as well as regulatory filings and reports, press releases and other public statements issued by the Company, and various agreements between the Company and its clients. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all clients of E*TRADE between July 12, 2011 and July 12, 2016 who placed trade orders that were routed in self-interested manner at the expense of its customers best interests and inconsistent with the duty of best execution. Plaintiff brings his claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

2. At all times relevant to this Complaint, E*TRADE acted as, among other things, a broker for its clients, routing their orders to various venues for execution.

3.      Brokers have various venues at their disposal to which orders can be routed. Such venues include exchanges, regional exchanges, electronic communications networks ("ECNs"), and third market makers (*i.e.*, dealers that buy and sell orders even if there is not a buyer or seller immediately available for the other side of a transaction). A broker may also "internalize" a client's order by filling the order with its own inventory.

4.      Brokers engaged in routing orders for their clients are under a duty of "best execution." That is, brokers have a responsibility to execute orders in a matter that is most beneficial to their clients, and are prohibited from taking actions which are not in their clients' best interests. This duty requires that brokers fill the clients' orders to the extent possible at the best price available.

5.      At all times relevant to this Complaint, E*TRADE was bound by a duty of best execution. Moreover, at all time relevant to this Complaint, E*TRADE acknowledged and represented to its clients that it was bound by a duty of best execution and that its practices complied with its duty.

6.      At all times relevant to this Complaint, E*TRADE acted as a broker, engaged in routing its client's orders to be executed. One such type of order, known as a "nonmarketable limit order," is an instruction from the client for the broker to deal in a certain number of securities at a specified price outside the current prevailing "ask" or "offer." "Market orders," on the other hand, are instructions to conduct transactions at the best available price. While clients can direct a broker to route nonmarketable limit orders and/or marketable orders to certain venues, over 95 percent of orders placed with E*TRADE are non-directed.

7.      When E*TRADE receives a non-directed order from its clients, it must act in accordance with its duty to provide the best execution of that trade and determine the market venue that would provide, among other considerations, the greatest "price improvement."

8.      Rather than route its clients' trade orders after giving due consideration to its duty of best execution, E*TRADE routes nearly half of its clients' orders to G1 Execution Services, LLC ("G1X"), a former affiliate of the Company, pursuant to an existing agreement, with the

remainder routed to the venues which provide the greatest liquidity rebates, payments made by the venues to E*TRADE relating to the number and size of orders that were routed.

9. Indeed, E*TRADE's routing practices of maximizing revenue has been a lucrative endeavor for the Company. Between 2011 through 2015, E*TRADE generated approximately $366 million in order flow revenue.

10. Accordingly, from at least 2011 through the date of this filing, E*TRADE routed its clients' non-directed orders without giving due consideration to its duty of best execution, and in a course of routine practice to maximize its own revenue.

11. As a result of this order routing in dereliction of its duty, E*TRADE failed to provide best execution for its clients, causing them material harm in the form of economic loss due to their orders going unfilled, underfilled, filled at a suboptimal price, and/or filled in a manner which adversely affects the order's performance post-execution.

12. Plaintiffs hereby seek to recover on behalf of themselves and all similarly-situated clients of E*TRADE the value they lost on account of the self-interested practice of order routing described herein.

## JURISDICTION AND VENUE

13. The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

14. The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because E*TRADE Financial resides in this District—E*TRADE Financial's principal executive offices are located at 1271 Avenue of the Americas, 14th Floor, New York, New York 10020. Further, many of the acts alleged herein, including the dissemination to the

investing public of the misleading statements and omissions at issue, occurred in substantial part in this District.

16. In connection with the acts, transactions, and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of national securities exchanges and markets.

## PARTIES

17. Plaintiff Craig L. Schwab is a client of E*TRADE and has been continuously throughout the past five years (the "Class Period"). Plaintiff is an individual and a resident of the State of California. As detailed in his certification (attached hereto as Exhibit A), Plaintiff purchased shares of U.S. based exchange-listed stocks in trades executed during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct.

18. Defendant E*TRADE Financial is a Delaware corporation, with its principal executive offices at 1271 Avenue of the Americas, 14th Floor, New York, New York 10020. E*TRADE Financial is a financial services company that provides brokerage and related products and services primarily to individual retail investors. E*TRADE Financial's competitive strategy is to attract and retain customers by emphasizing a hybrid model for investing, trading and saving for retirement that leads with best-in-class digital channels, backed by professional support and guidance. E*TRADE Financial also provides investor-focused banking products, primarily sweep deposits, to retail investors.

19. Defendant E*TRADE Securities is a Delaware corporation and a wholly-owned subsidiary of E*TRADE Financial. E*TRADE Securities is a registered broker-dealer and is the primary provider of brokerage products and services to E*TRADE Financial customers. Prior to February 2014, E*TRADE Securities was an operating subsidiary of E*TRADE Bank, which is also a subsidiary of E*TRADE Financial.

20. Defendant Paul T. Idzik has been a director of the Company and Chief Executive Officer since January 2013. Defendant Idzik is also President of E*TRADE Bank and a member of the E*TRADE Bank board.

21. Defendant David Herbert serves as E*TRADE Financial's Senior Vice President of Retail Services and was appointed as the President of E*TRADE Securities in August 2015. As head of retail brokerage services, Defendant Herbert oversees the brokerage business across all of the Company's products and channels.

## FURTHER SUBSTANTIVE ALLEGATIONS

### *Payments for Order Flow and Liquidity Rebates*

22. Broker-dealers are financial services firms that buy and sell stocks, bonds, and other assets both for their clients and their own accounts.

23. Certain broker-dealers hold shares of securities in their own inventory in order to create a market for both buyers and sellers of those securities. These broker-dealers, who risk the adverse effects of deleterious fluctuations in the prices of those securities in exchange for the benefit of creating a market for the securities, are known as "market makers."

24. Historically, market makers paid fees to regional intermediaries for their services in executing trades with other local firms on behalf of the market maker. In order to grow a guaranteed supply of liquidity in their markets, market makers began offering payments to not only the intermediaries, but also retail firms, including brokers, in exchange for the retail firms routing their orders to the market makers. This practice, which expanded from off-exchange securities (over-the-counter or "OTC" securities) to exchange-traded securities, came to be known as "payment for order flow." Over time, different types of venues, including ECNs and exchanges, also began making payments for order flow.

25. Market makers—including Bernard "Bernie" Madoff, who in large part pioneered the practice of paying for order flow—traditionally profited off this system by realizing the "spread" on the underlying security; that is, by buying at the "bid" price and selling at the "ask"

5

y

or "offer" price. For example, during the 1990s, Bernard Madoff Investment Securities—his broker-dealer operation—paid retail investors for order flow directed to a third market it had created. On this third market, Madoff's firm traded within the bid-ask spread, profiting off of the margins. It is estimated that in this manner Mr. Madoff diverted approximately ten percent of total trading volume away from the floor of the New York Stock Exchange ("NYSE").

26. Little has changed. Today, wholesale market makers still pay retail brokerages for order flow so that they can realize profits by exploiting the "dealer's turn," or the practice of buying at the bid price and selling at the offer. In other words, market makers incur up-front costs by paying to trade with retail stock investors, but nevertheless turn a hefty profit by matching buyers and sellers and pocketing the difference of the spread, without having to go to traditional exchanges.

27. E*TRADE, in its capacity as its clients' broker, receives payments for order flow from market-makers, such as G1X, to which the Company routes its clients' orders.

28. Another profitable aspect of paying for order flow from retail broker-dealers for venues is that retail brokers may "tag" their clients' order as retail. Venues, such as EDGX Exchange, Inc., pay brokers to mark its clients' orders as "retail," and in turn, venues charge hefty fees to its clients, commonly high frequency trades, for access to such information of its proprietary data feeds. The ordinary retail customer, however, is unable to afford access to these feeds, and thus receives no compensation for her order being designated as "retail."

29. By marking which orders are placed by retail customers, brokers compromise the integrity of the order and make it easy for sophisticated traders with access to the proprietary data feeds to employ strategies which take advantage of "mom-and-pop" investors.

<em><u>E*TRADE's Duty of Best Execution</u></em>

30. Broker-dealers have a duty to seek out best execution of their customers' orders. This duty derives from the duty of loyalty established in common law principles of agency, pursuant to which an agent is obligated to act in the best interests of the agent's principal at all times. In the context of transacting in securities, best execution requires that, when conducting a

transaction on behalf of a client, a broker seek the terms most favorable to the client that can possibly be obtained given the present circumstances.

31. When securities are traded in different venues, best execution requires that, absent instruction otherwise from the client, a broker-dealer ensure that the client's order be routed to the best possible venue. A broker achieves best execution when it endeavors to obtain the best price available, execute the transaction in the shortest possible time frame, maximize the likelihood that the transaction is executed in its entirety, and, where possible, seek "price improvement"—the execution of a trade at a price better than the best current public quote.

32. NASD Rule 2320 provided that E*TRADE, as a broker-dealer, would "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions." The factors to be considered in determining reasonable diligence were "(A) the character of the market for the security, e.g., price, volatility, relative liquidity, and pressure on available communications; (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to" E*TRADE.

33. Financial Industry Regulatory Authority ("FINRA") Rule 5310, which superseded NASD Rule 2320 on May 31, 2012, incorporates all of that Rule's provisions concerning a broker-dealer's duty of best execution.

34. E*TRADE has continually acknowledged that it owes its clients a duty of best execution and further promotes its purported adherence with its duty. Specifically, the "The E*TRADE Best Execution Advantage" section of E*TRADE's website states:

> ***We work with multiple market centers for end-to-end control over orders in an effort to provide the highest speed and quality of execution***. No specific statistic defines a quality execution. Therefore, E*TRADE dedicates a team to regular, rigorous reviews to find the right blend of execution price, speed, and price improvement. ***We utilize advanced order routing technology to seek the best execution available in the market***.

(emphasis added.)

7

35. Further, E*TRADE touts on its website, under the "Execution Guarantee" section, that it "utilizes advanced technology to quickly route your order in pursuit of liquidity and price improvement opportunities."

36. Had E*TRADE not promised and contracted to provide best execution of its clients' orders, Plaintiffs would have placed orders through broker-dealers who did promise to provide best execution.

### E*TRADE's Order Routing Practices

37. Despite E*TRADE's repeated representations that it employs a multi-factored, advanced order routing technology to achieve best execution in routing its clients' equity orders, E*TRADE's routing decisions are predetermined and routed in accordance with the G1X Agreement (defined below) and to the venues that generate the greatest order flow revenue.

38. Until February 2014, G1X, previously known as E*TRADE Capital Markets, LLC, was a subsidiary of the Company. As stated above, when E*TRADE routes its clients' orders to G1X, the market-maker first seeks to match trades within G1X's internal liquidity before searching other market makers, exchanges, and alternative trading systems.

39. In late 2013 it was announced that E*TRADE agreed to sell G1X to Susquehanna International Group LLP for $75 million. Notably, in connection with the sale of G1X, E*TRADE entered into an agreement with G1X for equity order routing and execution services, which demands that E*TRADE route at least 70% of its clients equity orders to G1X (the "G1X Agreement").

40. Since January 30, 2001, the SEC has required, under Rule 11Ac1-6 (now Rule 606), that broker-dealers that route customer equity orders make public quarterly reports that identify the venues to which the orders are routed for execution. These reports must also disclose the rebate that a broker-dealer receives for adding liquidity to the venue. SEC Rule 606 exempts broker-dealers from identifying execution venues that receive less than 5% of non-directed orders, provided that 90% of non-directed orders are identified.

41.     The 606 reports prepared by E*TRADE reveal that from at least 2014 through the date of this filing non-directed orders comprise at least 95% of E*TRADE's clients' orders. The 606 reports further reveal that E*TRADE engaged in a self-interested practice of routing nearly half of all non-directed to G1X, pursuant to the G1X Agreement, and the other half routed to venues which paid above average fees and rebates.

42.     As disclosed in the Company's annual reports on Form 10-K filed with the SEC, in the last five years alone, E*TRADE generated on average approximately $73.2 million a year in order flow revenue. Specifically, E*TRADE generated, at the expense of its clients' trade execution quality, $85 million in 2015, $92 million in 2014, $72 million in 2013, $58 million in 2012, and $59 million in 2011, in order flow revenue.

43.     Notably, E*TRADE's order flow revenue is a supplemental stream of revenue for the Company in addition to the base commissions it charges its clients per trade.  E*TRADE currently charges a commission on each order placed by its clients, varying from $7.99 or $9.99 per trade for orders entered online,  plus an additional $45 for orders placed with the assistance of an E*TRADE broker.

44.     As disclosed in the Company's annual reports on Form 10-K filed with the SEC, E*TRADE customers paid the Company $424 million, $456 million, $420 million, $378 million, and $436 million in 2015 through 2011, respectively, in commissions for executing their trades, purported to be in compliance with E*TRADE's duty of best execution.

### *E*TRADE Failed to Satisfy its Duty of Best Execution for its Clients*

45.     Despite E*TRADE's repeated claims that its routing practices satisfy its duty of best execution, they in fact demonstrate a clear disregard for E*TRADE's duties. Nearly all of E*TRADE's clients' orders are routed to the venues that would most benefit E*TRADE. Specifically, E*TRADE routed nearly half of its clients' orders  to G1X, pursuant to its existing G1X Agreement, and the remaining half were routed to the venues which provided above average rebates and fees.

46. As detailed above, FINRA Rule 5310 requires E*TRADE to consider a multitude of factors when making routing decisions. Specifically, E*TRADE must consider: "(A) the character of the market for the security (e.g., price, volatility, relative liquidity, and pressure on available communications); (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to the member and persons associated with the member."

47. These enumerated factors make clear that the duty of best execution entails a complex inquiry, and that no single venue is the "best" venue for all trades. Nevertheless, E*TRADE continually routed its clients' orders without considering these factors at all. Indeed, E*TRADE considered just two factors, not enumerated by FINRA: the G1X Agreement and which venues would pay it the highest liquidity rebates or payments for order flow.

48. Accordingly, E*TRADE routed nearly all of its clients' orders in a self-interested manner, which would provide the greatest incentives to itself, in abrogation of its duty of best execution.

## CLASS DEFINITION AND ALLEGATIONS

49. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure ("Rule") for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiff brings this action on behalf of himself and all members of the following class comprised of:

> **All clients of E*TRADE between July 12, 2011 and July 12, 2016 who place orders that were not executed in accordance with the Company's duty of best execution. Excluded from the Class are the officers, directors, and employees of E*TRADE. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.**

50. Plaintiff reserves the right to modify or amend the definitions of the Class after discovery.

51. *Numerosity*. Rule 23(a)(1). The members of the Class are so numerous that their individual joinder is impracticable. Defendants has over three million brokerage accounts. Plaintiff is informed and believes that the proposed Class contains at least hundreds of thousands of Defendants' clients who have been damaged by the Company's conduct as alleged herein. Record owners and other members of the Class may be identified from records maintained by E*TRADE and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52. *Existence of Common Questions of Law and Fact. Rule 23(a)(2)*. This action involves common questions of law and fact, which include, but are not limited to, the following:

    a.    whether the statements made by Defendants as part of their promises to provide, and assertions that they do provide, best execution of their clients' orders, discussed herein are true, or are reasonably likely to deceive, given the omissions of material fact described above;

    b.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    c.    whether statements made by the Defendants' officers, directors, and employees to the investing public during the Class Period misrepresented material facts about the Defendants' order routing practices;

    d.    whether Plaintiff and the other members of Class are entitled to damages; and

    e.    whether Plaintiff and the Class are entitled to injunctive relief, restitution, other equitable relief, and/or other relief as may be proper.

53. *Typicality. Rule 23(a)(3)*. All members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and members of the Class. By placing orders in connection with which Defendants failed to act upon due consideration to its duty of best execution, all members of the Class were subjected to the same wrongful conduct. Plaintiff's

claims are typical of the Class' claims and do not conflict with the interests of any other members of the Class. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

54. *Adequacy. Rule 23(a)(4).* Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interest adverse or antagonistic to those of the Class.

55. *Injunctive and Declaratory Relief. Rule 23(b)(2).* Defendants' actions regarding the deceptions and omissions relating to its routing of client orders are uniform as to members of the Class. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate respecting the Class as a whole.

56. *Predominance and Superiority of Class Action. Rule 23(b)(3).* Questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

    a. Absent a class action, members of the Class as a practical matter will be unable to obtain redress. Defendants' violations of their legal obligations will continue without remedy, additional clients will be harmed, and Defendants will continue to retain their ill-gotten gains;

    b. It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

    c. When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

    d. A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

e. A class action regarding the issues in this case does not create any problems of manageability;

f. Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate;

g. By pursuing a uniform course of conduct of routing their clients without paying due consideration to its duty of best execution, Defendants failed to provide best execution as a matter of policy and practice to all members of the Class; and

h. As a result of Defendants' order routing policy, each member of the Class suffered damages to an extent within the peculiar knowledge of the Defendants.

A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

57. Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully set forth herein.

58. This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59. During the Class Period, Defendants' senior managers engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon

Plaintiff and the other members of the Class; made various untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive Defendants' clients, including Plaintiff and other Class members, as alleged herein; (ii) cause the Class members to engage in a broker-client relationship with Defendants which they otherwise would not have done; (iii) cause the Class members to place orders with Defendants which they otherwise would not have placed; and (iv) deprive the Class members of the best execution of their orders. Furthermore, Defendants knew that by failing to provide them with best execution of their orders, each member of the Class would, and did, incur economic harm arising from almost all of their orders being routed to just one venue. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants' senior managers took the actions set forth herein.

60. Pursuant to the above plan, scheme, conspiracy and course of conduct, Defendants' senior managers participated directly or indirectly in the preparation and/or issuance of 606 Reports, testimony, press releases, and other statements and documents described above, including statements made to government entities, securities analysts, and the media that were designed to convince the public, in general, and Defendants' clients, in particular, that Defendants were providing best execution of their clients' orders when, in fact, they were not. Such 606 Reports, press releases, and other statements and documents were materially false and misleading in that they failed to disclose material information concerning Defendants' order routing practices and misrepresented the truth about same.

61. Defendants' senior managers had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants' officers, directors, and employees acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of

14

the statements made, although such facts were readily available to them. Said acts and omissions of Defendants' senior managers were committed willfully or with reckless disregard for the truth. In addition, each of Defendants' senior managers knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62. Information showing that Defendants' senior managers acted knowingly or with reckless disregard for the truth is peculiarly within their knowledge and control. The senior managers of E*TRADE had knowledge of the details of E*TRADE's order routing strategies and behavior.

63. Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants' senior managers were able to and did, directly or indirectly, control the content of the statements of E*TRADE. Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's routing of its clients' orders. As a result of the dissemination of the aforementioned 606 Reports, testimony, press releases, and other statements, the Class members placed orders through E*TRADE with an expectation of best execution throughout the Class Period. In ignorance of the adverse facts concerning Defendants' failure to provide best execution, which were concealed by Defendants' senior managers, Plaintiff and the other members of the Class placed orders through E*TRADE and relied upon the 606 Reports, testimony, press releases, and other statements disseminated by Defendants' senior managers, and were damaged thereby. By reason of the conduct alleged herein, Defendants, through their senior managers, knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with Defendants' routing of their orders during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against Defendants Idzik and Herbert**

65. Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully set forth herein. This Count is asserted against Defendants Idzik and Herbert and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) *et seq*.

66. During the class period, Defendants Idzik and Herbert participated in the operation and management of E*TRADE, and conducted and participated, directly and indirectly, in the conduct of E*TRADE's business affairs. By virtue of their positions as directors and executive officers, Defendants Idzik and Herbert knew that E*TRADE was pursuing a policy of routing orders in a self-interested course of conduct in order to maximize order flow revenue and adhere to the G1X Agreement, at the expense of achieving best execution for their clients' orders.

67. Due to their positions at E*TRADE, Defendants Idzik and Herbert were in a position of control and authority, and had a duty to ensure that the employees of the Company routed the Company's clients' trades in a manner that comported with duty of best execution owed to its clients. Throughout the class period, Defendants Idzik and Herbert instead exercised their power and authority to cause E*TRADE to engage in the wrongful acts complained of herein. Defendants Idzik and Herbert were "controlling persons" of E*TRADE within the meaning of Section 20(a) of the Exchange Act, and in this capacity they participated in the wrongful conduct alleged herein, which brought hundreds of millions of dollars of revenue to the Company at the expense of its clients.

68. By reason of the above conduct, Defendants Idzik and Herbert are liable pursuant to Section 20(a) of the Exchange Act for E*TRADE's violation of the duty of best execution which it owed to its clients.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, requests entry of an order as follows:

A. Declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class with Plaintiff as Class Representative and certifying Plaintiff's counsel as Class Counsel;

B. Directing E*TRADE to take all necessary actions to reform and improve its internal procedures to protect the Company and its clients from recurrences of the damaging events described herein;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

D. Granting Plaintiff such other and further relief as the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: July 22, 2016  **LEVI & KORSINSKY, LLP**

/s/ *Christopher J. Kupka*
Eduard Korsinsky
Christopher J. Kupka
LEVI & KORSINSKY, LLP
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*Counsel for Plaintiff and Proposed Lead Counsel for the Class*