## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Craig L. Schwab, Individually and on Behalf of All Others Similarly Situated, | ) ) ) Case No. 16-cv-5891-JGK |
| Plaintiff, | ) ) |
| vs. | ) <u>CLASS ACTION</u> ) |
| E*TRADE FINANCIAL CORPORATION, E*TRADE SECURITIES LLC, PAUL T. IDZIK, RODGER A. LAWSON, KARL A. ROESSNER, and DAVID HERBERT, | ) <u>AMENDED COMPLAINT FOR</u> ) <u>VIOLATIONS OF FEDERAL SECURITIES</u> ) <u>LAWS</u> ) ) <u>JURY TRIAL DEMANDED</u> ) |
| Defendants. | ) |

Lead Plaintiff Craig L. Schwab ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, allege the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by E*TRADE Financial Corporation ("E*TRADE Financial") and E*TRADE Securities LLC ("E*TRADE Securities," collectively with E*TRADE Financial, "E*TRADE" or the "Company"), as well as regulatory filings and reports, press releases and other public statements issued by the Company, and various agreements between the Company and its clients:

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all clients of E*TRADE between July 12, 2011 and July 12, 2016 who placed trade orders that E*TRADE routed in a self-interested manner at the expense of its customers' best interests and inconsistent with the duty of best execution. Plaintiff brings his claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

2.      At all times relevant to this Complaint, E*TRADE acted as, among other things, a broker for its clients, routing their orders to various venues for execution.

3.      Brokers have many venues at their disposal to which orders can be routed. These venues include exchanges, regional exchanges, electronic communications networks ("ECNs"), third market makers (*i.e.*, dealers that buy and sell orders even if there is not a buyer or seller immediately available for the other side of a transaction), and other alternative trading systems. A broker may also "internalize" a client's order by filling the order with its own inventory or matching it with a different client's opposing order.

4.      Brokers engaged in routing orders for their clients are under a duty of "best execution." The SEC, in Order Execution Obligations Release, No. 34-37619A, instructs that a "broker-dealer's duty of best execution derives from common law agency principles and fiduciary obligations, and is incorporated in [self-regulatory organization] rules and, through judicial and SEC decisions, the antifraud provisions of the federal securities laws. This duty of best execution requires a broker-dealer to seek the most favorable terms reasonably available under the circumstances for a customer's transactions." That is, brokers have a responsibility to execute orders in a matter that is most beneficial to their clients, and are prohibited from taking actions which are not in their clients' best interests. This duty requires, *inter alia*, that brokers fill their clients' orders to the fullest extent possible, at the best price available, as quickly as possible.

5.      At all times relevant to this Complaint, E*TRADE was bound by a duty of best execution. Moreover, at all time relevant to this Complaint, E*TRADE acknowledged and represented to its clients that it was bound by the duty of best execution and that its practices complied with best execution obligations.

6.      At all times relevant to this Complaint, E*TRADE acted as a broker, in which capacity it routed its clients' orders to be executed. One such type of order, known as a "nonmarketable limit order," is an instruction from the client for the broker to deal in a certain

2

number of securities at a specified price outside the current prevailing "ask" or "offer."[1] "Market orders," on the other hand, are instructions to conduct transactions at the best available price. There are also "marketable limit orders," which are instructions to buy a certain number of securities at or above the lowest displayed offer, or to sell a certain number of securities at or below the highest displayed bid. While clients can "direct" a broker to route nonmarketable limit orders and/or marketable orders[2] to certain venues, in which case the broker is not obligated to perform the same type of best execution determination, over 95 percent of orders placed with E*TRADE are non-directed. E*TRADE is obligated to perform best execution determinations so that it can route non-directed orders to the optimal venue.

7.    When E*TRADE receives a non-directed order from its clients, it must act in accordance with its duty to provide the best execution of that trade and determine the market venue that would provide, among other considerations, the fastest fill (*i.e.*, execution of the order as quickly as possible), the largest fill (*i.e.*, transaction of as much of the order volume as possible), and the best price and greatest opportunity for price improvement (*i.e.*, realization of a superior price than the one quoted at the time that the order is placed).

8.    Rather than route its clients' trade orders after giving due consideration to its duty of best execution, E*TRADE blindly routes nearly half of its clients' orders to G1 Execution Services, LLC ("G1X"), a former affiliate of the Company, pursuant to an existing agreement,

---

[1] There are also "marketable limit orders," instructions to deal in a certain number of securities inside the prevailing "ask" or "offer." For example, an instruction to sell 1,000 shares of stock at $3.00 which is currently priced at $2.00 would be nonmarketable, while an instruction to sell 1,000 shares of stock at $1.00 which is currently priced at $2.00 would be marketable, until such time as the price might drop below $1.00.

[2] "Marketable orders" shall mean to refer to both market orders and marketable limit orders, because both orders can be at least partially filled at the national best bid/offer price ("NBBO").

with the remainder routed to the venues which offer the greatest order routing rebates – payments offered by venues based on the number, size, and characteristics of orders routed to those venues.

9.      E*TRADE's routing practices are designed to guarantee a lucrative stream of revenue for the Company, without regard to E*TRADE's duty of best execution. Indeed, between 2011 through 2015, E*TRADE generated approximately $366 million in order flow revenue.

10.      Accordingly, from at least 2011 through the date of this filing, E*TRADE has routed its clients' non-directed orders in dereliction of the Company's duty of best execution.

11.      Predetermined routing agreements, pursuant to which a venue compensates a broker for order flow, present an inherent conflict of interest. On the one hand, brokers are obligated to continually review execution quality and route each of its clients' orders to the most appropriate destination. On the other hand, brokers who have entered into routing agreements are contractually precluded from routing based on the outcome of execution quality analyses because they have already committed to route a certain percentage of equity to a given venue, regardless of the quality of execution offered by that venue. The conflict was explained by Senator Carl Levin, Chairman of the Committee on Homeland Security and Governmental Affairs' Permanent Subcommittee on Investigations, in a letter to Securities and Exchange Commission ("SEC") Chairwoman Mary Jo White:

> The system creates a conflict of interest for stock brokers who have a legal duty to seek best execution of their customer's orders. [Paying for liquidity] creates an incentive for brokers to route customer orders to venues that offer brokers the highest rebate, or conversely, away from venues that charge brokers the highest fee, even when those venues may not offer best execution. Academic and market research into order routing decisions suggest that the conflict is resulting in real harm to investors.
>
> . . .
>
> A similar conflict exists in the practice of wholesale brokers paying retail brokers for order flow. Such payments create another incentive for brokers to maximize their own profits at the expense of best execution of customer orders. In addition,

while retail brokers must disclose the amount they receive per-share from wholesale brokers for order flow, the aggregate totals of such payments are typically not disclosed. As a result, in most cases, consumers are unaware that the fractions of a cent received by retail brokers per-share add up to a multi-million dollar conflict of interest.

12.     By implementing self-interested order routing practices E*TRADE failed, and continues to fail, to provide best execution of its clients' orders. E*Trade thereby caused, and continues to cause, its clients material harm in the form of economic loss due to their orders going unfilled, underfilled, filled at suboptimal prices, and/or filled in a manner that adversely affects post-execution performance, as described further herein.

13.     If not for E*TRADE's repeated promises and assurances that it would comply with the duty of best execution, Plaintiff would have sought the services of a broker that would have provided best execution.

14.     Plaintiff hereby seeks to recover on behalf of himself and all similarly-situated clients of E*TRADE the value they lost on account of E*TRADE's self-interested order routing practices.

## JURISDICTION AND VENUE

15.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

16.     The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because E*TRADE Financial resides in this District. E*TRADE Financial's principal executive offices are located at 1271 Avenue of the Americas, 14th Floor, New York, New York 10020. Further, many of the acts alleged herein, including the dissemination to the

investing public of the misleading statements and omissions at issue, occurred in substantial part in this District.

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of national securities exchanges and markets.

## PARTIES

19.     Plaintiff Craig L. Schwab is a client of E*TRADE and has been continuously from July 12, 2011 to present (the "Class Period"). Mr. Schwab is a resident of the State of California. As detailed in his certification (attached hereto as Exhibit A), Mr. Schwab purchased shares of U.S. based exchange-listed stocks in trades executed during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct.

20.     Defendant E*TRADE Financial is a Delaware corporation, with its principal executive offices at 1271 Avenue of the Americas, 14th Floor, New York, New York 10020. E*TRADE Financial is a financial services company that provides brokerage and related products and services primarily to individual retail investors.

21.     Defendant E*TRADE Securities is a Delaware corporation and a wholly-owned subsidiary of E*TRADE Financial. E*TRADE Securities is a registered broker-dealer and is the primary provider of brokerage products and services to E*TRADE Financial customers. Prior to February 2014, E*TRADE Securities was an operating subsidiary of E*TRADE Bank, which is also a subsidiary of E*TRADE Financial.

22.     Defendant Paul T. Idzik was a director of the Company and Chief Executive Officer from 2013 through his departure on September 12, 2016.

23.     Defendant Rodger A. Lawson has been a director of the Company since February 2012 and Chairman of the Board since May 2013. From August 2012 to January 2013 Defendant Lawson served as Lead Independent Director of the Company. On September 12, 2016, Defendant Lawson was appointed as the Company's Executive Chairman, and entered into an employment agreement with the Company.

24.     Defendant Karl A. Roessner was appointed as a director, Chief Executive Officer of the Company, and President of E*TRADE Bank on September 12, 2016. Prior to his appointment as Chief Executive Officer of the Company, Defendant Roessner served as Executive Vice President and General Counsel of the Company since May 2009.

25.     Defendant David Herbert serves as E*TRADE Financial's Senior Vice President of Retail Services and was appointed as the President of E*TRADE Securities in August 2015. As head of retail brokerage services, Defendant Herbert oversees the brokerage business across all of the Company's products and channels.

## FURTHER SUBSTANTIVE ALLEGATIONS

### Payment for Order Flow and Liquidity Rebates

26.     Broker-dealers are financial services firms that buy and sell stocks, bonds, and other assets both for their clients and their own accounts.

27.     Certain broker-dealers hold shares of securities in their own inventory in order to create a market for both buyers and sellers of those securities. These broker-dealers, who risk the adverse effects of deleterious fluctuations in the prices of those securities in exchange for the benefit of creating a market for the securities, are known as "market makers."

28.     Historically, market makers paid fees to regional intermediaries for their services in executing trades with other local firms on behalf of the market maker. In order to develop a guaranteed supply of liquidity in their markets, market makers began offering payments to not

only the intermediaries, but also retail firms, including brokers, in exchange for flow of retail firms' orders to the market makers. This practice, which expanded from off-exchange securities to exchange-traded securities, came to be known as "payment for order flow." Over time, different types of venues, including ECNs and exchanges, also began making payments for order flow.

29.     Market makers—including Bernard "Bernie" Madoff, who in large part pioneered the practice of paying for order flow—traditionally profited off this system by realizing the "spread" on the underlying security; that is, by buying at the "bid" price and selling at the "ask" or "offer" price. For example, during the 1990s, Bernard Madoff Investment Securities—his broker-dealer operation—paid retail investors for order flow directed to a third market it had created. On this third market, Madoff's firm traded within the bid-ask spread, profiting off of the margins. It is estimated that in this manner Mr. Madoff diverted approximately ten percent of total trading volume away from the floor of the New York Stock Exchange ("NYSE").

30.     Little has changed today. Wholesale market makers still pay retail brokerages for order flow so that they can realize profits by exploiting the "dealer's turn," or the practice of buying at the bid price and selling at the offer. In other words, market makers incur up-front costs by paying to trade with retail stock investors, but nevertheless turn a hefty profit by matching buyers and sellers and pocketing the difference of the spread, without having to go to traditional exchanges.

31.     As spreads have tightened, many venues adopted a "maker-taker model" to provide an incentive for brokers with non-marketable orders—*i.e.*, orders priced outside the prevailing marketable rate, such that the order could not be filled absent movement in the price of the security—to list such orders. This model, developed by the Island ECN in 1997, compensates brokers who "make" the market, or add liquidity, by listing non-marketable orders. On the other hand, the venue charges a fee to brokers who "take" liquidity by matching a marketable order with

an existing bid or offer at the order price. The liquidity fee charged to the "takers" typically exceeds the liquidity rebate credited to the "makers," and the venue pockets the difference.

32.     For example, a maker-taker venue may charge $0.003 per share for liquidity-taking orders (*i.e.*, marketable orders) and pay a rebate of $0.002 per share to post liquidity (*i.e.*, non-marketable orders). The venue would then generate in revenue the difference between the fee and the rebate, or in this example, $0.001 per share.

33.     The maker-taker model has been criticized by numerous market participants, FINRA, and the SEC, for creating significant conflicts of interests for broker-dealers. As explained by the SEC, "[i]n situations where a broker-dealer can earn a rebate or pay a lesser fee for routing its customer's orders to a particular venue, a conflict of interest may exist between the broker-dealer's duty of best execution and its own direct economic interest."

34.     As opposed to the "maker-taker model," exchanges may implement the traditional "customer priority model," under which exchanges charge transaction fees to liquidity providers that interact with retail customer orders, and use the proceeds to pay for order flow. Customer orders are given priority without any fees being assessed. In addition to creating broker-dealer conflicts, the maker-taker model incentivizes the short-term flipping of stocks and disfavors retail investors who may hold stocks for longer periods of time.

35.     E*TRADE, in its capacity as its clients' broker, receives payments for order flow from market-makers, such as G1X, to which the Company routes its clients' orders.

36.     In an effort to attract retail order flow, exchanges have created order types which provide no benefit to a retail trader and only serves the interests of a broker. For example, in December 2015, The NASDAQ Stock Market LLC ("NASDAQ") adopted a new order type titled "RTFY." Rather than execute on the exchange a client's order which was entered as a non-marketable limit order but became marketable when routed, an RTFY order will re-route the order

off-exchange to a market-maker. Thus, NASDAQ created an order type which primary benefit is to avoid a taker fee for retail broker-dealers. Moreover, as explained in greater detail below, the routing of the client's order off-exchange as it becomes marketable increases the likelihood of the market moving against the order and adverse selection harms.

37.     In November 2016, NASDAQ proposed a new order type, Retail Post-Only Order ("RPOO"), which further harms a client's trade for the sole benefit of a retail broker. Similar to a RTFY order, a RPOO order allows a broker-dealer to avoid paying an access fee when a non-marketable order becomes marketable *en route* to the exchange. As opposed to actually being executed at the price sought by the retail investor, a RPOO order is instead *canceled*. By allowing self-cancellation through RPOO, the exchange allows a retail broker-dealer to internalize or route the order to the venue of its choosing (in many cases, whichever venue would maximize its revenue). Again, as explained below, purposefully failing to execute a client's order as quickly as possible at the price sought by the client is not consistent with a broker's duty of beast execution.

38.     Another manner in which venues enable brokers to pad their own bottom line at the expense of retail investors' best interests is by allowing brokers to "flag" their clients' order as retail. Venues, such as Bats EDGX Exchange, Inc. ("EDGX"), pay brokers to mark their clients' orders as "retail," and in turn, venues charge hefty fees to their clients, commonly high frequency traders, for access to such information through venues' proprietary data feeds. The ordinary retail customer, however, is unable to afford access to these feeds, and thus receives no compensation for her order being flagged as "retail." Meanwhile, high frequency traders market actors that subscribe to the feeds may use this information asymmetry to, for example, strategically execute against retail orders when their algorithms foresee shifts in the market for a given security.

39.     By marking which orders are placed by retail customers through such retail attribution programs, brokers compromise the integrity of the order and make it easy for

sophisticated traders with access to the proprietary data feeds to employ strategies which take advantage of "mom-and-pop" investors.

### E*TRADE's Duty of Best Execution

40.    Broker-dealers have a duty to seek out the best possible destination for their customers' orders. This duty derives from the duty of loyalty established in common law principles of agency, pursuant to which an agent is obligated to act in the best interests of the agent's principal at all times. In the context of transacting in securities, best execution requires that, when conducting a transaction on behalf of a client, a broker seeks the terms most favorable to the client that can possibly be obtained given the present circumstances.

41.    When the same security is traded in different venues, best execution requires that, absent instruction otherwise from the client, a broker-dealer ensure that the client's order to transact in that security be routed to the best possible venue. A broker satisfies its duty of best execution when it endeavors to obtain the best price available, execute the transaction in the shortest possible time frame, maximize the likelihood that the transaction is executed in its entirety, and, where possible, seek "price improvement"—the execution of a trade at a price better than the best current public quote.

42.    Furthermore, FINRA instructs that when "a firm is routing order flow for automated execution, or internally executing such order flow on an automated basis, the SEC has indicated that simply obtaining the best bid or best offer (BBO) may not satisfy a firm's best execution obligation, particularly with respect to small orders," because by routing to a venue that simply executes at the NBBO a broker sacrifices the potential to obtain a superior execution price. Automatic order routing runs afoul best execution where it is undertaken blindly, without regard to whether alternative venues would have provided superior execution quality.

43.     For example, in 2008 the SEC settled an enforcement action it had brought against Scottrade, Inc. where that broker lacked written policies or procedures to assess liquidity at the market opening, and therefore did not consider the availability of executions that may be superior to the NBBO, notwithstanding that it was representing to its customers that its policy was to route orders based on liquidity at market opening in order to provide, where possible, executions at prices better than the NBBO. In that matter, '[o]nce Scottrade set its computers to route orders for a specific security to a certain market center, all orders were generally sent to that market center." The SEC determined that this practice violated Scottrade's duty of best execution.

44.     NASD Rule 2320 provided that E*TRADE, as a broker-dealer, would "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions." The factors to be considered in determining reasonable diligence were "(A) the character of the market for the security, e.g., price, volatility, relative liquidity, and pressure on available communications; (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to" E*TRADE.

45.     Financial Industry Regulatory Authority ("FINRA") Rule 5310, which superseded NASD Rule 2320 on May 31, 2012, incorporates all of that Rule's provisions concerning a broker-dealer's duty of best execution.

46.     A broker-dealer's duty to provide best execution for its clients' orders may not be transferred to another market actor or the execution venue. However, a third-party may incur the obligation. As explained by FINRA, "a broker-dealer that routes all of its order flow to another broker-dealer without conducting an independent review of execution quality would violate the duty of best execution."

47.    In addition to the more particularized order-by-order duties broker-dealers must adhere to when executing clients' orders, FINRA Rule 5310, Supplementary Material .09(b) requires that every broker-dealer conduct a "***regular and rigorous review*** of the quality of executions of its customers' orders" routed outside the firm. (emphasis added). Unless a broker-dealer conducts an order-by order review (which is required for internalizers), each broker-dealer must regularly review its order routing to evaluate which venue offers the most favorable terms of execution for a particular order, including, for example, execution price, execution speed, fill rate, and the likelihood that the trade will be executed.

48.    A broker-dealer's duty of best execution requires that the broker-dealer regularly review the execution quality of *all available venues*, not just those to which it currently routes orders.

### *E\*TRADE's Promises to Adhere to Its Duty of Best Execution*

49.    E\*TRADE has continually acknowledged that it owes its clients a duty of best execution and further promotes its purported adherence with its duty. Specifically, the "The E\*TRADE Best Execution Advantage" section of E\*TRADE's website states:

> ***We work with multiple market centers for end-to-end control over orders in an effort to provide the highest speed and quality of execution.*** No specific statistic defines a quality execution. Therefore, E\*TRADE dedicates a team to regular, rigorous reviews to find the right blend of execution price, speed, and price improvement. ***We utilize advanced order routing technology to seek the best execution available in the market.***

(emphasis added).

50.    On its website, E\*TRADE touts, under the "Execution Guarantee" section, that it "utilizes advanced technology to quickly route your order in pursuit of liquidity and price improvement opportunities."

51.    In its 2015 Form 10-K annual report, E*TRADE disclosed that it has an Order Routing and Best Execution Committee ("ORBEC"), comprised of E*TRADE management, which "is responsible for evaluating the Company's execution statistics and order-routing determinations for stock and listed options and determining how, if at all, the Company will alter its order-routing methodology to improve execution quality. The ORBEC also reviews order flow rates and payments received from G1 Execution Services, LLC and other unaffiliated market centers for comparable order flow directed to them." A virtually identical statement was made in E*TRADE's 2014 10-K.

52.    E*TRADE's Customer Agreement iterates these best execution promises. The Company represents to its clients that non-directed "orders that are accepted by E*TRADE will be transmitted to the appropriate exchange or other market for placement and execution." Again, in the Customer Agreement's "Order Routing" section, the Company promises to adhere to its duty of best execution, stating:

> ***Consistent with the overriding principle of best execution, E*TRADE, using a computerized system, routes orders for listed and over-the-counter equity securities*** and options to market centers, including regional exchanges, securities dealers who make markets over-the-counter and alternative trading systems. ***E*TRADE takes a number of factors into consideration in determining where to route customers' orders***, including the speed of execution, price improvement opportunities (executions at prices superior to the then prevailing inside market), automatic execution guarantees, the availability of efficient and reliable order handling systems, the level of service provided, the cost of executing orders, whether it will receive cash or non-cash payments for routing order flow and reciprocal business arrangements. ***E*TRADE regularly and rigorously reviews its order-routing practices and the execution quality obtained from market centers to which it routes orders.*** Pursuant to Rule 606 of the Exchange Act, quarterly reports that disclose the significant market centers to which the E*TRADE orders in covered securities, as well as the material aspects of each relationship, including payment for order flow arrangements, will be made available on the E*TRADE website.

53.    Had E*TRADE not promised and contracted to provide best execution of its clients' orders, Plaintiff would have placed orders through broker-dealers who did promise to provide best execution.

### E*TRADE's Order Routing Practices

54.    Despite E*TRADE's repeated representations that it employs a multi-factored, advanced order routing technology to achieve best execution in routing its clients' equity orders, E*TRADE's routing decisions are predetermined and either routed in accordance with an equities order handling agreement (the G1X Agreement (defined below)) or to the venues that otherwise, through order routing payments generate the greatest revenue for *ETRADE, without regard to execution quality.

#### E*TRADE's Equities Order Handling Agreements

55.    In 2001, E*TRADE purchased a wholesale market-making business for $173 million, which would become G1X. G1X was a subsidiary of the Company, and was previously known as E*TRADE Capital Markets, LLC, until February 2014. When E*TRADE routes its clients' orders to G1X, the market maker first seeks to match the orders with G1X's internal liquidity before searching other market makers, exchanges, and alternative trading systems.

56.    According to the Wall Street Journal, prior to its eventual sale of G1X in 2013, E*TRADE was "alone among the major online brokers in running such a market-making unit in-house[.]"

57.    E*TRADE and G1X's "best execution" practices first came to be questioned following Citadel Investment Group's ("Citadel") investment into the broker-dealer. On November 29, 2007, E*TRADE announced that affiliates of Citadel invested $2.55 billion into the then-faltering Company. In connection with the investment, E*TRADE, E*TRADE Securities, and the market-maker affiliate of Citadel entered into an Equities and Options Order Handling

Agreement dated November 29, 2007 (the "Citadel Agreement"), pursuant to which E*TRADE committed to route 40% of its customer equites orders to Citadel for three years. Under the terms of the Citadel Agreement, should E*TRADE have routed less than nearly all of its customer options orders and 40 percent of its customer equities orders to Citadel, E*TRADE would have been required to pay Citadel up to $75 million in liquidated damages.

58.    Additionally, under the agreement, Citadel received the right to appoint a member to E*TRADE's Board. In June 2009, Kenneth C. Griffin, Citadel's Founder and Chief Executive Officer, was appointed as a director of E*TRADE, pursuant to a director nomination right granted to Citadel in 2007.[3]

59.    In its Form 10-Q for the third quarter of 2012, E*TRADE disclosed that it had begun to review its order handling practices and pricing for order flow between E*TRADE Securities and G1X. "The purpose of the review [wa]s to ensure that E*TRADE Securities [wa]s providing 'best execution' of customer orders and dealing appropriately with its affiliate under applicable regulatory standards." E*TRADE disclosed that a third-party firm was conducting the review and that the Company notified certain regulatory agencies of its investigation.

60.    Although the investigation had just begun and the investigators had yet to complete its "analysis of the data necessary to assess the quality of execution" by E*TRADE Securities, the initial findings reported numerous areas for improvement of the Company's order routing "standards, processes and compliance procedures."

61.    Notably, the public filing stated that "[t]he review was prompted by questions raised by a member of our Board of Directors[.]" An article by *The Wall Street Journal* identified

---

[3] After numerous public and private disagreements with the Company over, *inter alia*, its routing practices, in March 2013, Griffin sold Citadel's remaining stake in E*TRADE and resigned from the Board.

Mr. Griffin as the whistleblowing director. Specifically, it was reported that months prior to the foregoing disclosure, Mr. Griffin had raised concerns to the Board regarding the execution quality of E*TRADE's clients' orders that were routed to G1X relative to the quality of execution that could have been provided had the orders been routed to other venues.

62.     In February 2013, E*TRADE announced that it had completed its review of its order handling practices and pricing for order flow between E*TRADE Securities and G1X. The third-party's report "identified shortcomings in the Company's historical methods of measuring best execution quality and suggested additions and changes to the Company's standards, processes and procedures for measuring execution quality and for monitoring and testing transactions between [E*TRADE] Bank and non-Bank affiliates to ensure compliance with relevant regulations."

63.     Nearly five months after the Company disclosed that it had "shortcomings" in its order routing and execution practices with G1X, E*TRADE began to shop G1X. On a conference call with investors for the second quarter of 2013, E*TRADE's then-Chief Financial Officer Matthew Audette confessed that the decision to sell G1X was based on "operational and regulatory" risks – *i.e.*, E*TRADE could not afford an additional fine for favoring an affiliated entity at the expense of its clients' interests.

64.     It was estimated that E*TRADE could fetch up to $225 million for G1X. Among the bidders reportedly interested in G1X were Citadel, Virtu Financial, Two Sigma, RGM Advisors, and a bank that had no market-making unit at that time.

65.     In October 2013 it was announced that E*TRADE agreed to sell G1X to Susquehanna International Group LLP ("Susquehanna") for $75 million. Most importantly, in connection with the sale of G1X, E*TRADE entered into an agreement with G1X for equity order

routing and execution services, which requires that E*TRADE route at least 70% of its clients equity orders to G1X through 2019 (the "G1X Agreement").

66.    While certain terms of the G1X Agreement have been disclosed, the Company has not made the G1X Agreement itself public.

67.    On August 6, 2013, E*TRADE filed its quarterly report on Form 10-Q with the SEC in which it disclosed that "[o]n July 11, 2013, FINRA notified E*TRADE Securities LLC and G1 Execution Services, LLC that it is conducting an examination of both firms' routing practices." Specifically, it was reported that FINRA was investigating "whether E*Trade's [sic] customers get the best prices on G1 and how E*Trade [sic] decides which ones to send there."

68.    On March 19, 2015, the Company received a Wells notice—a notification from a regulator that it intends to recommend that enforcement proceedings be commenced—from FINRA's Market Regulation Department relating to the adequacy of E*TRADE Securities' order routing disclosures and supervisory process for reviewing execution quality during the period covered by the Company's 2012 internal review.

69.    In June 2016, FINRA announced that it had censured and fined E*TRADE $900,000 for failing to conduct an adequate review of the quality of execution of its customers' orders and for supervisory deficiencies concerning the protection of customer order information.

70.    FINRA found that the ORBEC "lacked sufficiently accurate information to reasonably assess the execution quality it provided its customers." Specifically, FINRA faulted the ORBEC for: (1) failing to take into account internalized order flow sent to E*TRADE's affiliated market maker, G1X; (2) "relying on execution quality statistics based on flawed data in assessing the execution quality of the market centers to which it routed its customers' orders;" and (3) being "overly reliant on comparisons of the firm's overall execution quality with industry and custom

averages, rather than focusing on comparisons to the actual execution quality provided by the market centers to which the firm routed orders."

71.    Moreover, FINRA also found that E*TRADE allowed members of G1X to access confidential information about its clients' orders, and also "regularly accepted requests from G1X to change prioritization in [sic] E*Trade's order routing system and to redirect certain order flow, without determining whether these changes would improve the quality of execution received by its customers."

*E*TRADE's Focus on Maximization of Order Flow Revenue*

72.    Since January 30, 2001, the SEC has required, under Rule 11Ac1-6 (now Rule 606), that broker-dealers that route customer equity orders make public quarterly reports that identify the venues to which non-directed orders are routed for execution.[4] These reports must also disclose all material aspects of a broker-dealer's relationship with each venue, including a description of any arrangement for payment for order flow or liquidity rebates. SEC Rule 606 exempts broker-dealers from identifying execution venues that receive less than 5% of non-directed orders, provided that 90% of non-directed orders are identified.

73.    Although Rule 606 requires that E*TRADE inform its clients of these payments because of the conflicts of interest E*TRADE may face, it does not require broker-dealer to disclose specific details of the conflicts, including financial inducements received from each venue or rebates received from the destinations to which E*TRADE routes orders.

74.    The 606 reports prepared by E*TRADE reveal that non-directed orders comprise approximately 95% of E*TRADE's clients' orders. The 606 reports further reveal that E*TRADE has engaged, and is presently still engaged, in a self-interested practice of routing nearly half of all

---

[4] Directed orders are excluded from the routing statistics required to be produced under Rule 606.

non-directed to G1X, pursuant to the G1X Agreement, and the balance of its clients' orders to venues which paid excessive fees and rebates.

75.    For example, E*TRADE's Rule 606 report for the third quarter of 2016 details that the Company routed 30.92% of limit orders for NYSE-listed securities to EDGX , 18.77% of such orders to Citigroup Global Markets, Inc., and 12.60% of such orders to NASDAQ OMB. These three venues each pay more than $.0025, or 25 "mills," per share transacted. Tellingly, the Company routed *0.00%* of market orders to each of these three venues:

### 1. New York Stock Exchange Listed Securities

| For quarter ending 9/30/2016 | Non-Directed Orders | Market Orders | Limit Orders | Other Orders |
|---|---|---|---|---|
| Orders Routed to: | | | | |
| G1 Execution Services, LLC[1] | 43.20% | 51.23% | 27.15% | 83.48% |
| Citadel Securities, LLC[2] | 18.34% | 32.09% | 7.09% | 4.86% |
| Bats EDGX Exchange, Inc.[3] | 14.01% | 0.00% | 30.92% | 0.00% |
| KCG Americas, LLC[4] | 9.45% | 15.23% | 3.19% | 11.50% |
| Citigroup Global Markets, Inc.[5] | 8.50% | 0.00% | 18.77% | 0.00% |
| Nasdaq OMX[6] | 5.71% | 0.00% | 12.60% | 0.00% |
| Wolverine Securities, LLC[7] | 0.78% | 1.41% | 0.27% | 0.16% |
| UBS Securities, LLC[8] | 0.02% | 0.04% | 0.01% | 0.00% |
| Total E*TRADE Orders | 95.65% | 45.79% | 45.30% | 8.92% |

[1] G1 Execution Services, LLC (G1) was an affiliate of E*TRADE until it was sold in February 2014. In connection with the sale E*TRADE entered into an agreement with G1 for equity order routing and execution services, for which it receives certain payments from G1. Payments received from G1 averaged less than $0.0010 per share.

[2] Payments received from Citadel Securities, LLC averaged less than $0.0010 per share.

[3] Payments received from Bats EDGX Exchange, Inc. averaged less than $0.0031 per share.

[4] Payments received from KCG Americas, LLC averaged less than $0.0010 per share.

[5] Citigroup Global Markets may utilize NYSE ARCA for the display of limit orders.  Payments received from Citigroup Global Markets, Inc. averaged less than $.0027 per share.

[6] Payments received from Nasdaq OMX averaged less than $0.0028 per share.

[7] Payments received from Wolverine Securities, LLC averaged less than $0.0010 per share.

[8] Payments received from UBS Securities, LLC averaged less than $0.0010 per share.

76.    In other words, E*TRADE routed to these venues when it stood to be paid liquidity rebates and payments for order flow, but did not route to these venues when it would have been E*TRADE that would have had to make order routing payments.

77.     As disclosed in the Company's annual reports on Form 10-K filed with the SEC, in the last five years alone, E*TRADE generated on average approximately $73.2 million a year in order flow revenue. Specifically, E*TRADE generated—at the expense of its clients' trade execution quality—$85 million in 2015, $92 million in 2014, $72 million in 2013, $58 million in 2012, and $59 million in 2011, in order routing payments.

78.     Notably, E*TRADE's order flow revenue is a supplemental stream of income for the Company in addition to the base commissions it charges its clients per trade. E*TRADE currently charges a commission on each order placed by its clients, varying from $7.99 or $9.99 per trade for orders entered online, plus an additional $45 for orders placed with the assistance of an E*TRADE broker.

79.     As disclosed in the Company's Form 10-K annual reports, E*TRADE customers paid the Company $424 million, $456 million, $420 million, $378 million, and $436 million in 2015 through 2011, respectively, in commissions for executing their trades in purported compliance with the duty of best execution.

### *E*TRADE Failed to Satisfy its Duty of Best Execution*

80.     Despite E*TRADE's repeated claims that its routing practices satisfy its duty of best execution, the Company's routing practices in fact evidence a clear disregard for E*TRADE's duties. Nearly all of E*TRADE's clients' orders are routed to the venues that would most benefit E*TRADE. Specifically, E*TRADE routed nearly half of its clients' orders to G1X, pursuant to its obligations under the G1X Agreement, and the balance to the venues which offered the greatest order routing payments.

81.     As detailed above, FINRA Rule 5310 requires E*TRADE to consider a multitude of factors when making routing decisions. Specifically, E*TRADE must consider: "(A) the character of the market for the security (e.g., price, volatility, relative liquidity, and pressure on

available communications); (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to the member and persons associated with the member."

82.    FINRA Rule 5310 further demands that E*TRADE to conduct **regular and rigorous** reviews of the execution quality its clients receive and evaluate whether competing venues would provide superior execution quality. Moreover, FINRA Rule 5310, Supplementary Material .09 explicitly provides that E*TRADE is required to consider the existence of internalization by G1X and payment for order flow arrangements when conducting this regular and rigorous review of execution quality.

83.    These enumerated factors make clear that the duty of best execution entails a complex inquiry. Nevertheless, E*TRADE continually routed its clients' orders without considering these factors at all. Indeed, as revealed in its Rule 606 Reports and detailed above, E*TRADE considered just two factors, not enumerated by FINRA: (i) the G1X Agreement; and (ii) the magnitude of the order routing payments E*TRADE could pocket (or avoid paying).

84.    There are serious concerns raised by E*TRADE's routing of clients' orders to G1X, both prior and subsequent to E*TRADE's sale of the market-maker. While G1X specializes in certain securities, like foreign-based stocks, E*TRADE's clients are primarily mom-and-pop investors who by and large do not trade in foreign based stocks. Furthermore, foreign exchange transactions accounted for only approximately 7% of E*TRADE's total fees and service charges in 2015, and less than one-fifth the size of domestic order flow revenue. In terms of size, G1X pales in comparison to market-makers like Citadel, KCG Holdings, Citigroup, and UBS AG. Even though some of these other venues, like Citigroup, which offers exorbitant order routing payments, may present best execution issues of their own, it strains credulity that a comparatively small venue

like G1X could offer execution quality superior to that offered by more than seventy other venues on a whopping 40+% of trades.

85.     Indeed, G1X has repeatedly shown that it implements questionable business practices that harm clients. As mentioned above, in June 2016, E*TRADE was fined $900,000 for G1X's order routing practices. One of the most concerning violations found was that there were dually registered employees of E*TRADE and G1X that had access to E*TRADE's order routing system. In particular, some of these employees had access to E*TRADE's order management and routing systems, which allowed them to, among other things, (i) view all customer orders; (ii) view order statistics and monitoring tools; (iii) view and update exception tickets; (iv) create orders; and (v) cancel orders. Furthermore, G1X routinely redirected certain order flow and changed the prioritization of E*TRADE's clients' orders.

86.     Moreover, FINRA also found that E*TRADE allowed members of G1X to access confidential information about its clients' orders. In fact, FINRA found that E*TRADE "regularly accepted requests from G1X to change prioritization in [sic] E*Trade's order routing system and to redirect certain order flow, without determining whether these changes would improve the quality of execution received by its customers."

87.     In October 2014, E*TRADE announced that it would pay $2.5 million to the SEC in connection with allegations that between March 2007 and April 2011 E*TRADE Securities and G1X failed in their gatekeeper roles and improperly engaged in unregistered sales of microcap stocks on behalf of their customers. The SEC found that E*TRADE Securities and G1X sold billions of penny stock shares for customers during a four-year period while ignoring red flags that the offerings were being conducted without an applicable exemption from the registration provisions of the federal securities laws. Stephen L. Cohen, then-Associate Director of the SEC's

Division of Enforcement, admonished E*TRADE and G1X for failing to fulfill their obligations under securities laws, and thereby depriving investors of critical protections afforded to them.

88.    In 2009, E*TRADE was required to pay a $33.9 million fine to the SEC in connection with G1X's alleged failure "to meet its basic obligation as a specialist to serve public customer orders over its own proprietary interests while executing trades on the Chicago Stock Exchange ('CHX')." Specifically, the SEC alleged that G1X, *inter alia*, (i) traded ahead of its customers' orders, and (ii) improperly interpositioned itself between customers' orders on opposite sides of a trade.

89.    The compatibility of the G1X Agreement with the duty of best execution is further called into question when one considers E*TRADE's routing behavior vis-à-vis Citadel. E*TRADE made similar best execution representations to its clients back when it was routing 40% of its equities orders to Citadel pursuant to the Citadel Agreement. Yet, once the Citadel Agreement expired, E*TRADE dramatically decreased the share of its clients' orders that it routed to Citadel. This raises the question of how a venue can provide best execution 40% of the time, but suddenly no longer able to provide the same execution quality once a broker is no longer contractually obligated to route payments to that venue.

90.    E*TRADE's thoughtless and predetermined routing of its clients' orders, whether when it was an affiliate and thus the Company was seeking to advance the best interests for G1X, or after G1X was sold pursuant to the G1X Agreement, demonstrates E*TRADE's lack of consideration of factors relevant to best execution.

*Harm Caused by E*TRADE's Self-interested Routing Practices*

91.    On July 13, 2016, the SEC announced a prosed amendment to Rule 606 to address various conflicts of interests which broker-dealers face when routing clients' orders (the "July 2016 Proposal"). The SEC acknowledged that "broker-dealer order routing practices can

significantly affect the competition among markets" and create potential conflicts, because payment to a broker-dealer from venues may influence the broker-dealer's order routing practices. One of the most prevalent conflicts of interests facing broker-dealers identified by the SEC was the routing of clients' orders to various trading centers that employ different pricing structures, including retail attribution programs.

92.    At a hearing before the Permanent Subcommittee on Investigations of the Senate's Committee on Homeland Security and Governmental Affairs, Thomas W. Farley, the President of NYSE Group, testified that a routing strategy designed to maximize rebates and order flow payments creates an inherent conflict of interest. Joseph Brennan, the Vanguard Group's Head of Global Equity Index Group, further noted that Vanguard does not accept order flow payments out of concern for the conflict of interests that such payments automatically produce.

93.    A broker-dealer's opportunity to provide price improvement for a client's trade comes at the direct expense of payments for order flow and liquidity rebates. Given that market-makers make small amounts of money off of the spread on each trade, and that market-makers are only willing to pay so much of that money back to the broker, the payment comes in the form of either price improvements or payment for order flow. Indeed, even brokers sometimes acknowledge this inherent conflict. Gregg Murphy, senior vice president of brokerage products at Fidelity Investments, which stopped accepting payment for order flow in 2014[5], explained: "***The market makers are not both going to pay you a lot for order flow and then turn around and provide your customers with a high level of price improvement***[.]"

---

[5] Fidelity still accepts liquidity rebates. Because it does not route market orders to venues that pay the highest take fees, but does route non-marketable orders to high rebate venues, it—like E*TRADE—is still disadvantaging its clients on non-marketable orders routed to exchanges, as discussed below.

94.     SEC Chairwoman White has also voiced skepticism about brokers' ability to secure price improvement while receiving payment for order flow: "When retail brokers negotiate with off-exchange market making firms for directing customer's marketable orders to those firms, why do the negotiations include both the level of price improvement expected for investor orders and the payment of millions of dollars to the broker?"

95.     Similarly, with respect to liquidity rebates, a study released in May 2012 by Woodbine Associates, Inc. ("Woodbine"), a financial consulting firm, found that liquidity rebates are costing investors as much as $5 billion per annum. Woodbine's analysts limited their study to only marketable limit orders, but nevertheless found that orders on venues that paid higher liquidity rebates were executed at prices inferior to orders on venues with lesser/no rebates. This study indicated that brokers who pursue the maximum rebate when routing marketable limit orders achieve execution inferior to that which would be achieved by seeking lesser liquidity rebates.

96.     A 2015 study by Robert Battalio, *et. al.*,[6] who performed a multivariate analysis on proprietary order data obtained from a major broker-dealer's smart order routing system from October and November 2012, concluded that displayed nonmarketable limit orders resting on exchanges offering higher liquidity rebates filled slower and less often than similar orders on venues offering lower liquidity rebates. The analysis evidenced that a policy of routing nonmarketable limit orders to venues offering higher liquidity rebates does not offer best execution. The Battalio Study identified four brokers who "route orders in a manner that suggests a focus on liquidity rebates": Fidelity, Scottrade, TD Ameritrade, and E*TRADE.

97.     The Battalio Study compared pairs of identical nonmarketable limit orders posted on different venues, measuring the time it took each order to fill, as well as the extent to which the

---

[6] Battalio, R., Corwin, S., and Jennings, R., Can Brokers Have it All? On the Relation between Make-Take-Fees and Limit Order Execution Quality. (pending) (the "Battalio Study").

order filled, from the time that the pair of orders first co-existed. This aspect of the Battalio Study found that the venue offering lower liquidity rebates was more likely to fill the nonmarketable limit order, and—in instances where both venues filled the order—was far more likely to fill the order more quickly. Mr. Battalio testified at the Hearing that nonmarketable limit orders routed to an exchange with higher rebates were as much as 25 percent less likely to be executed. This poor execution is due to the fact that orders with smaller, or no, taker-fees are automatically chosen first by the computer algorithms used by broker-dealers to determine the "best execution" venue. This leads to fewer interested counterparties available to trade with, and lowers the fill rate for, among other retail investors, E*TRADE's clients.

98.     The trading centers that pay the highest rebate for providing liquidity generally charge the highest fee for removing liquidity. These venues are generally lower on the routing table for broker-dealers seeking to remove liquidity due to the high take fee. Thus, if a broker-dealer places an order seeking to provide liquidity at such a venue, the order may not receive an execution due to the venue's low position on routing tables. High rebate venues also are likely to attract a large number of non-marketable orders, so that the customer queue position, and likelihood of execution, may be lower than on low rebate venues.

99.     Moreover, nonmarketable orders that sit on a venue with high taker fees, are more likely to be traded against when the prevailing price moves against them. As explained by the SEC: "an order to buy resting at $9.50 on an exchange with a high taker fee might not get filled if the market price fell to $9.50 and then moved up, because that exchange likely would be ranked low on market participants' routing tables. However, that order necessarily would be filled if the market price to sell fell to $9.49 or below."

100.    Sviatoslav Rosov, an analyst in the capital markets policy group at CFA Institute, explained how this adverse selection works in an article entitled "HFT, Price Improvement, Adverse Selection: An Expensive Way to Get Tighter Spreads?":

> Now, consider market makers who post visible limit orders. Their orders do not typically interact with uninformed retail order flow — this is always being internalized. Where does that leave them? They are trading with relatively more informed order flow and therefore are more likely to be on the wrong side of a trade — or increased adverse selection. But what does this actually look like?
>
> This phenomenon can be observed in the consolidated tape data because trades will execute off-exchange when the quotes are stable and only interact with lit orders when the quotes change or "roll." What's happening here is that internalizers are causing trades to occur inside the quote by offering price improvement (as described above). When they see order imbalances that predict the quote is about to change or "roll," they neutralize their net position by hitting the lit quote.
>
> For example, if they have a net long position just before a quote rolls down, they will seek to sell at the bid knowing that they can imminently re-purchase at the lower future ask price. This manifests itself in the consolidated tape as a series of off-exchange trades executed at the NBBO, followed by an on-exchange trade just as the quote rolls. In this way, internalizers and HFTs are liquidity providers when quotes are stable, but liquidity takers when quotes roll — the posted quote is merely acting as insurance for this strategy.
>
> This is a strikingly clean example of adverse selection in action — internalizers are mopping up uninformed retail order flow and only interacting with lit orders when the lit orders are on the wrong side of the trade. No wonder market makers are concerned about the toxicity of order flow in the market! For other market participants this is worrying because the incentive to post lit orders is compromised. This is the reason for the rise of maker-taker markets in which participants are paid a rebate to post limit orders and are charged a fee to access limit orders.

101.    Indeed, certain exchanges even have order types that allow sophisticated investors to obtain priority over orders posted on lit exchanges. Scott Patterson of The Wall Street Journal chronicled one such order type, Hide Not Slide, in an a graphic accompanying an article entitled "For Superfast Stock Traders, a Way to Jump Ahead in Line":



102.    In addition to the findings based on proprietary data described above, the Battalio

Study also analyzed data from the NYSE's TAQ database. This analysis showed that realized

29

spreads, which the authors note provide an estimate of the gross revenue earned by liquidity providers, are greater at venues that post lower liquidity rebates. Specifically, the data showed that limit orders on the BX, a venue paying a rebate of 14 mills to liquidity takers (*i.e.*, a venue charging a fee to liquidity providers), realized a spread of $.0065. Contrarily, those limit orders on the three venues charging the highest permissible take fee (and, correspondingly, offering the highest liquidity rebate), realized spreads between -$.0035 and -$.006. Put simply, these data indicated that a policy of routing orders to venues offering higher liquidity rebates does not offer best execution.

103.    Nonmarketable limit orders on EDGX (to which E*TRADE routed 46% of limit orders[7] in the fourth quarter of 2012) realized the lowest possible spread, indicating that they also realized the lowest gross revenue of any of the limit orders listed on all of the venues that were part of the analysis.

104.    The Battalio Study also analyzed limit order execution across multiple venues when each of the venues was at the inside quote (*i.e.*, the best price at which to consummate a transaction across competing market centers). The authors found that the data supported previous academic work finding that fees influenced the routing of marketable orders to venues charging the lowest taker fee (or, it follows, in the case of taker-maker venues (discussed below), the highest taker rebate) for removing liquidity. In such instances, depth on the venues offering the highest taker fee (and correspondingly, the highest liquidity rebate) was two to three times as great as that of the

---

[7] E*TRADE's Rule 606 disclosures do not differentiate between marketable and nonmarketable limit orders. Given that TD Ameritrade disclosed in its 606 report that it had routed 49% of limit orders that quarter to EDGX and a TD Ameritrade executive later testified that they had routed "virtually all" nonmarketable limit orders that quarter to EDGX, it is reasonable to infer—as the Battalio Study authors did—that "it is likely that the majority of the limit orders routed by these brokers to market makers are marketable and the majority of the limit orders they route to EDGX and [another high-fee venue] are nonmarketable."

venues charging the lowest fee/lowest liquidity rebate. Consequently, nonmarketable limit orders routed to the venues paying the greatest rebates to liquidity providers take longer to be filled than nonmarketable limit orders on the venues paying the lowest rebates to liquidity providers. In other words, venues that offer the highest rebates and lowest take fees attract less demand to interact with posted liquidity, and are thus unlikely to provide best execution of clients' orders.

105.    Finally, the authors of the Battalio Study performed a multivariate analysis of the at-the-quote data, and found once again that realized spreads for the limit orders analyzed are inversely related to maker rebates/taker fees. The authors found that this is the case irrespective of whether all venues are at the inside quote, and after controlling for stock characteristics and market conditions.

106.    The Battalio Study authors conclude that their results indicate an impact of limit order routing decisions on some measures of limit order execution quality, such that "routing decisions based primarily on rebates/fees appear to be inconsistent with best execution. There is a significant opportunity cost associated with routing all nonmarketable limit orders to a single venue offering the highest liquidity rebates."

107.    The Battalio Study adds to a growing body of empirical support demonstrating that brokers who pursue a strategy of routing to venues which pay the highest liquidity rebates do so at the expense of achieving best execution for their clients.

108.    There is an inverse relationship between the length of time a resting limit order has been posted on an exchange and that order's fill-rate and subsequent performance. Consequently, such orders executed on inverted exchanges (also known as "taker-maker model") —*i.e.*, exchanges which pay rebates for liquidity-absorbing and charge fees for liquidity-providing

orders—perform better after trading by roughly the amount of the rebate difference, as evidenced in the following graph[8]:



109.    Pragma Trading, a firm which provides independent analysis of market structures and trading results, performed its own empirical analysis using publicly available TAQ data for several days in June 2011. It found that the cost of trade execution "has a very strong influence on the market's routing preferences when price is held equal." The percentage of analyzed orders routed to the inverted-price exchanges was "whopping" compared to those exchanges' market shares, leading the firm to conclude that "when there is a choice of where to take liquidity, the pecking order is clear and coincides exactly with cost." Indeed, NasdaqBX (BOSTON) received 36% of orders despite its 6% market share. When NasdaqBX did not have the inside quote, Bats

---

[8] Source: Rogers, Kipp. https://mechanicalmarkets.wordpress.com/2015/03/10/who-executes-retail-trades-a-look-at-market-share-and-payment-for-order-flow/ (Accessed December 12, 2016). Nasdaq Bx (BSX), Bats BYX (BatsY), and EdgeA (EdgeA) are inverted exchanges. Resting limit orders on EdgeX perform poorer than like orders on any of the inverted exchanges.

BYX (BYX) received over 30% of orders. When neither NasdaqBX or Bats BYX had the inside

quote, DirectEdge EdgeA (EdgeA) received over 30% of orders[9]:



**FIGURE 3**

Percentage of trades executed at each venue, given that a certain set of venues had the inside price.

110.    By routing nonmarketable limit orders to inverted exchanges, a broker would

therefore be able to "hop the queue" and gain execution priority for a liquidity-providing order

over like orders posted at other exchanges which are more expensive for a party seeking to absorb

liquidity.

111.    Some brokers reacted to release of the Battalio Study with hostility. The CEO of

TD Ameritrade, for example, claimed that it would be foolish to risk foregoing a $9.99 commission

for order routing payments worth only one quarter or one fifth as much. Professor Battalio

responded to this criticism by pointing out that, when retail investors do not receive execution of

their non-marketable limit orders because they are routed to an improper venue, they often change

the price—thereby decreasing their gains or exacerbating their losses—in order to complete the

---

[9] Source:  Pragma Securities, LLC, "Inverted-Price Destinations and Smart Order Routing" No. 2
(Nov. 28, 2011).

transaction they would have conducted at a better price had their orders been properly routed. Thus, brokers still end up making their commission at the expense of retail traders' bottom line.

112.    In addition to the profit-maximizing routing practices E*TRADE has put in place for nonmarketable orders, it also routes its clients' marketable orders in the most self-interested manner possible, first seeking to satisfy its contractual obligation to G1X or otherwise realize payment for order flow. Indeed, even where liquidity exists only on maker-taker venues, E*TRADE's policy of routing marketable orders to low take-fee venues, rather than high-fee venues, negatively impacts execution quality. In its July 2016 Proposal, the SEC explained:

> Broker-dealers may seek to minimize trading costs by first routing orders to trading centers with the lowest take fees. However, these venues are likely to offer liquidity providers relatively low rebates so the available liquidity may be less than at a high rebate venue. Accordingly, the *liquidity available to a marketable order routed to a low rebate venue may offer less size or fewer opportunities for price improvement than may be available at high rebate venues*. Even where the broker-dealer ultimately routes a marketable order to other high take fee venues, prices can move quickly in today's highly automated, electronic markets, and broker-dealers may miss trading opportunities for an institutional customer by prioritizing low take fee venues in their routing tables.

(emphasis added).

113.    Furthermore, the SEC summarized the conflicts created when a broker-dealer internalizes or routes order flow to affiliated venues:

> While constrained by its best execution obligation, a broker-dealer still may be incentivized to internalize customer order flow or route to an affiliated venue so that it can benefit from the execution by, among other things, capturing the trading profits or transaction fees. Internalization or execution at affiliated venues, however, may not offer the most favorable terms of execution. Likewise, a broker-dealer may be incentivized to first route customer order flow to venues with which it receives payment for order flow. Again, execution at such venues may not maximize the best execution opportunities of institutional orders. *Accordingly, opportunities for internalization, or execution at affiliated venues or those with which the broker-dealers has payment for order flow arrangements, create additional potential conflicts of interest between the broker-dealer's duty of best execution and its own direct economic interest*.

114.    FINRA listed order routing practices and best execution of customer trades as a priority area of focus for the upcoming year. In its "2015 Regulatory and Examination Priorities Letter," dated January 6, 2015, FINRA reported it was "presently conducting a sweep of firms that route a significant percentage of their unmarketable customer limit orders to trading venues that provide the highest trading rebates for providing liquidity." FINRA further noted its concern "that firms may receive inferior executions of their customers' unmarketable limit orders because of market movements during the pendency of the orders, while the firm still collects a trading rebate. As part of the sweep, FINRA is in the process of reviewing routing decisions for marketable versus non-marketable orders and how such decisions are impacted by rebates."

115.    In November 2015, FINRA issued Regulatory Notice 15-46, which provided guidance to broker-dealers on their best execution obligations in routing and executing customer orders in equities. FINRA issued the guidance in order to provide greater clarity on a broker's duty "[i]n light of the increasingly automated market for equity securities" and to "remind firms of their obligations, as previously articulated by the Securities and Exchange Commission (SEC) and FINRA, to regularly and rigorously examine execution quality likely to be obtained from the different markets trading a security."

116.    Similarly, the Office of Compliance Inspections and Examinations of the SEC listed "examining broker-dealers' compliance with best execution duties in routing equity order flow," as a priority for 2015.

117.    To address these concerns, some exchanges have already proposed capping maker rebates and taker fees. NYSE, for example, has proposed a "grand bargain" which would reduce the maximum exchange fee at 5 mils. BATS, likewise, has proposed a cap starting at 5 mils, though this cap would increase for stocks with larger spreads.

118. In conjunction with a cap on rebates and fees, the grand bargain included a "trade-at" rule, which would require all trades be executed on an exchange, unless an off-exchange venue can offer a significantly better price than displayed on-exchange. Currently, about 75-80% of off-exchange volume is executed at the NBBO. By adopting a trade-at rule for off-exchange orders the conflict posed by order flow revenue for brokers will largely be eliminated.

119. Alternatively, if a broker-dealer wishes to collect payments for order flow and liquidity rebates, it can simply pass through the fees and rebates to customers.

120. In the July 2016 Proposal, the SEC proposed amendments to Rule 606 that would expand the information required to be disclosed by broker-dealers in connection with retail orders. In particular, the new rules would require a broker-dealer, such as E*TRADE, to disclose: (i) more detailed information about the payments it receives from execution venues or paid to such venues; (ii) its Rule 606 data monthly, rather than quarterly; and (iii) separately report information for marketable and non-marketable limit orders. Additionally, broker-dealers would be required to post their Rule 606 reports on their website for three years. E*TRADE's current practice is to remove each quarter's report as new ones are posted.

121. Among the new details that will be required to be disclosed, for the 10 venues to which the largest number of total non-directed orders were routed for execution and for any venue to which five percent or more of non-directed orders were routed for execution, broker-dealers must disclose the net aggregate amount of any payment for order flow received, payment from any profit-sharing relationship received, transaction fees paid per share, and transaction rebates received, both as a total dollar amount and per share for non-directed market orders, non-directed marketable limit orders, non-directed non-marketable limit orders, and other non-directed orders.

122. Furthermore, the disclosure would have to include a description of the terms of any payment for order flow and any profit-sharing arrangements that may influence a broker-dealer's

order routing decision, including, among other things: (i) incentives for equaling or exceeding an agreed upon order flow volume threshold; (ii) disincentives for failing to meet an agreed upon minimum order flow threshold; (iii) volume-based tiered payment schedules; and (iv) agreements regarding the minimum amount of order flow that the broker-dealer would send to a venue.

123.    Commenting on the proposed amendments to Rule 606, SEC Chairwoman White stated:

> These proposed rules are intended to bring order handling disclosure in line with modern technology and market practice, providing valuable information to retail and institutional investors about how their orders are treated… This information should provide investors more transparency and a powerful new tool to more effectively monitor broker-dealer routing decisions, especially when combined with the additional disclosures from alternative trading systems proposed by the Commission late last year.

124.    At all times relevant to the Complaint, E*TRADE had access to its own proprietary data, and regularly convened the ORBEC.

125.    In spite of the foregoing, E*TRADE pursued a practice of blindly routing its clients' orders pursuant to the G1X Agreement and whichever venues would pay the highest order routing payments, thereby failing to provide best execution for its clients.

126.    In FINRA's guidance on broker-dealers' duties of best execution the regulator stated that, given advances in order routing technology, best execution committees, such as E*TRADE's ORBEC, are able to conduct order-by-order review of the execution quality they provide for its clients' equity securities and standardized options orders. Nevertheless, E*TRADE and the ORBEC failed to implement order routing practices that would provide best execution.

127.    Thus, nearly half of E*TRADE's clients' orders are routed to G1X, which has repeatedly been found to act with extreme disregard for the duty of best execution, and the balance are routed to the venues willing to pay E*TRADE the most, a practice which has repeatedly been deemed incongruous with the duty of best execution.

128.    Accordingly, E*TRADE routed nearly all of its clients' orders in a self-interested manner, which would provide the greatest incentives to itself, in abrogation of its duty of best execution.

## CLASS ALLEGATIONS

129.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure ("Rule") for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiff brings this action on behalf of himself and all members of the following class comprised of:

> **All clients of E*TRADE from July 12, 2011 to the present who place orders that were not executed in accordance with the Company's duty of best execution. Excluded from the Class are the officers, directors, and employees of E*TRADE. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.**

130.    Plaintiff reserves the right to modify or amend the definitions of the Class after discovery.

131.    *Numerosity. Rule 23(a)(1).* The members of the Class are so numerous that their individual joinder is impracticable. Defendants service over three million brokerage accounts. Plaintiff is informed and believes that the proposed Class contains at least hundreds of thousands of Defendants' clients who have been damaged by the Company's conduct as alleged herein. Record owners and other members of the Class may be identified from records maintained by E*TRADE and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

132.    *Existence of Common Questions of Law and Fact. Rule 23(a)(2).* This action involves common questions of law and fact, which include, but are not limited to, the following:

a.    whether the statements made by Defendants as part of their promises to provide, and assertions that they do provide, best execution of their clients' orders, discussed herein

are true, or are reasonably likely to deceive, given the omissions of material fact described above;

b.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

c.     whether statements made by the Defendants' officers, directors, and employees to the investing public during the Class Period misrepresented material facts about the Defendants' order routing practices;

d.     whether Plaintiff and the other members of Class are entitled to damages; and

e.     whether Plaintiff and the Class are entitled to injunctive relief, restitution, other equitable relief, and/or other relief as may be proper.

133.    *Typicality. Rule 23(a)(3).* All members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and members of the Class. By placing orders in connection with which Defendants failed to act upon due consideration of their duty of best execution, all members of the Class were subjected to the same wrongful conduct. Plaintiff's claims are typical of the Class' claims and do not conflict with the interests of any other members of the Class. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

134.    *Adequacy. Rule 23(a)(4).* Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interest adverse or antagonistic to those of the Class.

135.    *Injunctive and Declaratory Relief. Rule 23(b)(2).* Defendants' actions regarding the deceptions and omissions relating to their routing of client orders are uniform as to members of the Class. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate respecting the Class as a whole.

136.    *Predominance and Superiority of Class Action. Rule 23(b)(3).* Questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

a.    Absent a class action, members of the Class as a practical matter will be unable to obtain redress. Defendants' violations of their legal obligations will continue without remedy, additional clients will be harmed, and Defendants will continue to retain their ill-gotten gains;

b.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

c.    When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

d.    A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

e.    A class action regarding the issues in this case does not create any problems of manageability;

f.    Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate;

g.    By pursuing a uniform course of conduct of routing their clients' orders without paying due consideration to their duty of best execution, Defendants failed to provide best execution as a matter of policy and practice to all members of the Class; and

h.    As a result of Defendants' order routing policy, each member of the Class suffered damages to an extent within the peculiar knowledge of the Defendants.

137.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
*Against All Defendants*

138.    Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully set forth herein.

139.    This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

140.    During the Class Period, Defendants' senior managers engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and

artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive Defendants' clients, including Plaintiff and other Class members, as alleged herein; (ii) cause the Class members to engage in a broker-client relationship with Defendants which they otherwise would not have done; (iii) cause the Class members to place orders with Defendants which they otherwise would not have placed; and (iv) deprive the Class members of the best execution of their orders. Furthermore, Defendants knew that by failing to provide them with best execution of their orders, each member of the Class would, and did, incur economic harm arising from almost all of their orders being routed to just one venue. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants' senior managers took the actions set forth herein.

141.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, Defendants' senior managers participated directly or indirectly in the preparation and/or issuance of 606 Reports, testimony, press releases, and other statements and documents described above, including statements made to government entities, securities analysts, and the media that were designed to convince the public, in general, and Defendants' clients, in particular, that Defendants were providing best execution of their clients' orders when, in fact, they were not. Such 606 Reports, press releases, and other statements and documents were materially false and misleading in that they failed to disclose material information concerning Defendants' order routing practices and misrepresented the truth about same.

142.    Defendants' senior managers had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants' officers, directors, and employees acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements

made, although such facts were readily available to them. Said acts and omissions of Defendants' senior managers were committed willfully or with reckless disregard for the truth. In addition, each of Defendants' senior managers knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

143.    Information showing that Defendants' senior managers acted knowingly or with reckless disregard for the truth is peculiarly within their knowledge and control. The senior managers of E*TRADE had knowledge of the details of E*TRADE's order routing strategies and behavior.

144.    Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants' senior managers were able to and did, directly or indirectly, control the content of the statements of E*TRADE. Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's routing of its clients' orders. As a result of the dissemination of the aforementioned 606 Reports, testimony, press releases, and other statements, the Class members placed orders through E*TRADE with an expectation of best execution throughout the Class Period. In ignorance of the adverse facts concerning Defendants' failure to provide best execution, which were concealed by Defendants' senior managers, Plaintiff and the other members of the Class placed orders through E*TRADE and relied upon the 606 Reports, testimony, press releases, and other statements disseminated by Defendants' senior managers, and were damaged thereby. By reason of the conduct alleged herein, Defendants, through their senior managers, knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

145.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with Defendants' routing of their orders during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
*Against Defendants Idzik, Lawson, Roessner, and Herbert*

146.    Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully set forth herein. This Count is asserted against Defendants Idzik, Lawson, Roessner, and Herbert and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) *et seq.*

147.    During the class period, Defendants Idzik, Lawson, Roessner, and Herbert participated in the operation and management of E*TRADE, and conducted and participated, directly and indirectly, in the conduct of E*TRADE's business affairs. By virtue of their positions as directors and executive officers, Defendants Idzik, Lawson, Roessner, and Herbert knew that E*TRADE was pursuing a policy of routing orders in a self-interested course of conduct in order to maximize order flow revenue and adhere to the G1X Agreement, at the expense of achieving best execution for their clients' orders.

148.    Due to their positions at E*TRADE, Defendants Idzik, Lawson, Roessner, and Herbert were in a position of control and authority, and had a duty to ensure that the employees of the Company routed the Company's clients' trades in a manner that comported with duty of best execution owed to its clients. Throughout the class period, Defendants Idzik and Herbert instead exercised their power and authority to cause E*TRADE to engage in the wrongful acts complained of herein. Defendants Idzik, Lawson, Roessner, and Herbert were "controlling persons" of E*TRADE within the meaning of Section 20(a) of the Exchange Act, and in this capacity they participated in the wrongful conduct alleged herein, which brought hundreds of millions of dollars of revenue to the Company at the expense of its clients.

149.    By reason of the above conduct, Defendants Idzik, Lawson, Roessner, and Herbert are liable pursuant to Section 20(a) of the Exchange Act for E*TRADE's violation of the duty of best execution which it owed to its clients.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, requests entry of an order as follows:

A. Declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class with Plaintiff as Class Representative and certifying Plaintiff's counsel as Class Counsel;

B. Directing E*TRADE to take all necessary actions to reform and improve its internal procedures to protect the Company and its clients from recurrences of the damaging events described herein;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

D. Granting Plaintiff such other and further relief as the Court may deem just and proper under the circumstances.

*[continued on next page]*

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: December 12, 2016            **LEVI & KORSINSKY, LLP**

                    /s/ *Christopher J. Kupka*
                    Eduard Korsinsky
                    Nicholas I. Porritt
                    Nancy A. Kulesa
                    Christopher J. Kupka
                    Jonathan D. Lindenfeld
                    30 Broad Street, 24th Floor
                    New York, New York 10004
                    Telephone:  (212) 363-7500
                    Facsimile:  (212) 363-7171

                    *Counsel for Lead Plaintiff and Lead Counsel for the Class*