**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
─────────────────────────────────

SCHWAB, INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED,

                   16-cv-05891 (JGK)

            **Plaintiff,**

                   <u>OPINION AND ORDER</u>

       - against –

E*TRADE FINANCIAL CORPORATION ET AL,

           **Defendants.**
─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

This is a securities action brought by the lead plaintiff, Charles L. Schwab (the "plaintiff"), on behalf of a proposed class of clients of E*TRADE Securities LLC ("E*TRADE") who placed securities trade orders with the broker-dealer between July 11, 2011 and the present (the "Class Period"). In Count One, the plaintiff asserts violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against E*TRADE and E*TRADE Financial Corporation ("E*TRADE Financial") (collectively, the "corporate defendants"). In Count Two, the plaintiff asserts control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Paul T. Idzik ("Idzik"), the former Chief Executive Officer of E*TRADE Financial, and Karl A. Roessner ("Roessner"), the current Chief Executive Officer of E*TRADE Financial (collectively, the "individual defendants").

1

In a Memorandum Order and Opinion dated April 3, 2017, this Court dismissed common law claims against E*TRADE and E*TRADE Financial that arose out of the same conduct at issue here because those claims were precluded by the Securities Litigation Uniform Standards Act (the "SLUSA"). See Rayner v. E*TRADE Fin. Corp., No. 16-CV-7129 (JGK), 2017 WL 1232730, at *7 (S.D.N.Y. Apr. 3, 2017), appeal docketed, No. 17-1487 (2d Cir. May 8, 2017). Familiarity with that decision is presumed.

The defendants have moved to dismiss the Second Amended Complaint (the "SAC") for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

For the following reasons, the motion is **granted**.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should

not be dismissed if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Securities Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff[s] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation

3

regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see also In re Eletrobras Sec. Litig., No. 15-CV-5754 (JGK), 2017 WL 1157138, at *1-2 (S.D.N.Y. Mar. 27, 2017).

## II.

The following facts are undisputed or accepted as true for purposes of the defendants' motion to dismiss.

E*TRADE Financial is a Delaware corporation, with its principal place of business in New York, that provides brokerage and related services to individual retail investors. SAC ¶ 21.

4

E*TRADE is a Delaware limited liability company that is a wholly owned subsidiary of E*TRADE Financial.[1] SAC ¶ 22. Before 2014, E*TRADE was an operating subsidiary of E*TRADE Bank, which is also a subsidiary of E*TRADE Financial. SAC ¶ 22. E*TRADE is a broker-dealer registered with the United States Securities and Exchange Commission (the "SEC"), and is the primary provider of brokerage products and services to E*TRADE Financial's customers. SAC ¶ 22.

Idzik was the CEO and a director of E*TRADE Financial from January 22, 2013 through his departure on September 12, 2016. SAC ¶ 23; see also Form 8-K dated January 17, 2013.[2]

From May 2009 to September 12, 2016, Roessner served as the Executive Vice President and General Counsel of E*TRADE. SAC ¶ 24. On September 12, 2016, Roessner became the CEO and a director of E*TRADE Financial, and the President of E*TRADE Bank. Form 8-K dated September 12, 2016; see also SAC ¶ 24.

Brokers, such as E*TRADE, can route orders for execution to third-party venues, such as exchanges and market makers. SAC ¶ 3. A "non-directed order" is a standard type of order that a client can place with E*TRADE where E*TRADE (as opposed to the

---

[1] The SAC alleges that "E*TRADE Financial is liable for all statements made by E*TRADE because E*TRADE['s] statements at all relevant times were attributable to, controlled by, and authored by E*TRADE Financial," SAC ¶ 59, which the defendants do not dispute.

[2] All filings with the SEC cited in this Opinion and Order refer to filings by E*TRADE Financial unless otherwise noted.

client) chooses the trading venue for the order. SAC ¶ 7. The SAC alleges that "over 95 percent of orders placed with E*TRADE are non-directed." SAC ¶ 7.

According to the SAC, E*TRADE has two primary sources of revenue: the commissions that its customers pay in exchange for routing orders and the payments for order flow ("Payments for Order Flow" or "PFOF") that it receives from venues under the "maker-taker" model. SAC ¶¶ 30, 87. Under the maker-taker model, venues pay brokerage firms for "making" a market or adding liquidity for certain types of orders, while venues charge brokers an access or "take" fee for matching a marketable order with an existing bid or offer. SAC ¶ 30. The SAC alleges that venues compete for order flow by maximizing PFOF amounts to brokers, such as E*TRADE. SAC ¶ 30.

The maker-taker model, including the receipt of PFOF, is heavily regulated by the federal securities regime. See, e.g., Regulation NMS, Exchange Act Release No. 34–51808, 2005 WL 1364545 (June 9, 2005); see also Rayner, 2017 WL 1232730, at *3. There is no allegation that the receipt of PFOF is inherently wrongful; indeed, the SEC permits broker-dealers to receive PFOF subject to certain disclosure requirements. 17 C.F.R. § 240.10b-10(a)(2)(i)(C); see also Exchange Act Rule 606, 17 C.F.R. § 242.606 (requiring the disclosure of quarterly reports related to the receipt of PFOF).

E*TRADE has a duty of best execution, which, among other things, requires it to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions." FINRA Rule 5310(a)(1)[3]; see also SAC ¶¶ 39-41, 43-44.

The gist of the allegations in the SAC is that E*TRADE repeatedly assures the market that it will execute orders consistent with its duty of best execution even though it has no intention of delivering on those promises. The SAC alleges that E*TRADE is actually pursuing a routing strategy designed to maximize the receipt of PFOF, which results in the delivery of something less than best execution and thus less advantageous prices for its clients. See SAC ¶¶ 1, 41, 92.

The SAC in particular faults "predetermined routing agreements" between E*TRADE and other venues in which E*TRADE agrees to route a certain percentage of its orders to a venue in exchange for PFOF. Such agreements allegedly lock E*TRADE into providing order flow to the venue regardless of best execution considerations. SAC ¶¶ 12, 63.

The SAC alleges that E*TRADE's use of such agreements began before the Class Period. In November 2007, E*TRADE agreed to

---

[3] FINRA Rule 5310 superseded NASD Rule 2320 on May 31, 2012, and incorporates NASD Rule 2320's provisions concerning a broker-dealer's duty of best execution. See SAC ¶¶ 44, 90.

route 40% of its customer equities orders to Citadel Securities LLC, an affiliate of Citadel Investment Group ("Citadel"), for three years. SAC ¶ 66. Once the agreement (the "Citadel Agreement") expired, the SAC alleges that E*TRADE decreased the proportion of orders routed to Citadel Securities, which the SAC claims implicates E*TRADE's knowledge that such arrangements are inconsistent with best execution. SAC ¶¶ 100, 107.

Citadel Securities' order handling practices during this period have drawn regulatory scrutiny. See SAC ¶¶ 101-05. According to a 2017 Consent Order with the SEC, from 2007 through 2010, Citadel Securities implemented certain routing and internalization practices that resulted in worse prices for retail marketable orders. In the Matter of Citadel Sec. LLC Respondent., Release No. 10280, at *6-7 (Jan. 13, 2017). While the Consent Order found that Citadel Securities misrepresented these practices to retail broker-dealers, id. at *3, the SAC faults the defendants for failing to detect the issue in their own independent review of the orders routed to Citadel Securities by E*TRADE. SAC ¶¶ 106-07.

According to the SAC, E*TRADE has had similarly problematic routing arrangements with another wholesale market-maker, G1 Execution Services, LLC ("G1X"), that began before the Class

Period and has continued through the present.[4] SAC ¶¶ 9, 64.
Those arrangements are the focus of this action. Acquired in
2001, G1X was a subsidiary of E*TRADE Financial until February
2014. SAC ¶ 64; Form 8-K dated February 10, 2014. According to
the SAC, "When E*TRADE routes its clients' orders to G1X, the
market maker first seeks to match the orders with G1X's internal
liquidity before searching other market makers, exchanges, and
alternative trading systems" for matches. SAC ¶ 64.

Pursuant to a director appointment provision in the Citadel
Agreement, Citadel appointed its founder and CEO, Kenneth C.
Griffin ("Griffin"), to E*TRADE Financial's Board of Directors
in June 2009. SAC ¶ 67. In 2012, Griffin raised concerns to the
Board regarding the quality of the execution of orders routed by
E*TRADE to G1X, "prompt[ing]" E*TRADE Financial to disclose in
October 2012 that it had "initiated a review of order handling
practices and pricing for order flow between E*TRADE Securities
LLC and [G1X] . . . to ensure that E*TRADE Securities [was]
providing 'best execution' of customer orders and dealing
appropriately with [G1X] under applicable regulatory standards."
2012 Third Quarter Form 10-Q at 109; SAC ¶¶ 68, 70.

---

[4] G1X was named "E*TRADE Capital Market, LLC" before February
2013. See 2012 Form 10-K at 1; see also SAC ¶ 64. For
convenience, the entity is referred to only as G1X in this
Opinion and Order.

In February 2013, E*TRADE Financial disclosed that it had completed its review, which identified "shortcomings in [E*TRADE Financial's] historical methods of measuring best execution quality." 2012 Form 10-K at 17; SAC ¶ 71. E*TRADE Financial announced that it would implement recommended "additions and changes" to its "standards, processes and procedures for measuring execution quality . . . ." 2012 Form 10-K at 17.

In March 2013, Griffin resigned from the Board. SAC ¶ 70. In July 2013, FINRA "notified E*TRADE [] and [G1X] that it [was] conducting an examination of both firms' routing practices." SAC ¶ 76. FINRA eventually sent E*TRADE Financial a Wells Notice in 2015 "relating to the adequacy of E*TRADE Securities' order-routing disclosures and supervisory process for reviewing execution quality during the period covered by [E*TRADE Financial's] 2012 internal review (July 2011 - June 2012)." 2015 Second Quarter Form 10-Q at 74; SAC ¶ 77. In June 2016, FINRA announced that it had censured and fined E*TRADE Financial $900,000 (the "FINRA Censure and Fine") for failing to conduct an adequate review of the quality of execution for its customers' orders and for supervisory deficiencies concerning the protection of customer order information.[5] SAC ¶ 78.

---

[5] FINRA's announcement is available at http://www.finra.org/newsroom/2016/finra-fines-etrade-900k-best-execution-and-protection-customer-order-information.

In the aftermath of the 2012 internal review and amidst the FINRA inquiry, the plaintiff alleges that E*TRADE Financial decided to sell G1X. SAC ¶ 72. On an earnings call dated July 24, 2013, then-E*TRADE Financial CFO Matthew Audette ("Audette") attributed the desire to sell G1X to "operational and regulatory" risks. Transcript of 2013 Second Quarter Earnings Call dated July 24, 2013 at 8; SAC ¶ 72.

E*TRADE Financial sold G1X to an affiliate of the Susquehanna International Group LLP ("Susquehanna") on February 10, 2014. Form 8-K dated February 10, 2014; SAC ¶ 74. However, the plaintiff alleges that the divestment did not end E*TRADE's perverse entanglement with G1X: E*TRADE Financial disclosed contemporaneous with the sale that it and Susquehanna had "entered into an order flow agreement" (the "G1X Agreement") to "route 70 percent of our customer equity flow to [G1X] over the next five years, subject to best execution standards." Form 8-K dated February 10, 2014; SAC ¶ 74.

Based on E*TRADE's disclosures pursuant to Exchange Act Rule 606, the SAC alleges that E*TRADE routes a disproportionate number of orders to G1X and other venues that pay "excessive fees and rebates" for order flow, a practice that cannot be explained unless E*TRADE is discounting its promises to provide best execution in favor of maximizing the receipt of PFOF and its obligations under the G1X Agreement to route a certain

percentage of orders to G1X. SAC ¶¶ 63, 83-85, 89, 93, 98-99, 120.

The allegations are bolstered by third-party industry and academic studies that have concluded that a broker-dealer's focus on obtaining the highest amount of PFOF tends to interfere with best execution. <u>See</u> SAC ¶¶ 112-128. In particular, the SAC alleges that the "Battalio Study" concluded based on a multivariate analysis of proprietary broker-dealer data that E*TRADE is a broker-dealer (among others, such as TD Ameritrade) that is routing orders with a "focus on liquidity rebates," which is inconsistent with best execution standards. SAC ¶ 113. The plaintiff also points to testimony before Congress by industry members to the effect that routing strategies designed to maximize PFOF conflict with best execution. SAC ¶¶ 109, 115. As a general matter, FINRA and the SEC have expressed concerns over whether PFOF create conflicts of interest that compromise execution quality. <u>See</u> SAC ¶¶ 132-134.

According to the SAC, the defendants have repeatedly misrepresented E*TRADE's adherence to best execution standards. E*TRADE's customer agreement --- which is posted on its website and provided to each of its customers --- states:

> Consistent with the overriding principle of best
> execution, E*TRADE, using a computerized system,
> routes orders for listed and over-the-counter equity
> securities and options to market centers, including
> regional exchanges, securities dealers who make

markets over-the-counter and alternative trading systems. *E\*TRADE takes a number of factors into consideration in determining where to route customers' orders, including the speed of execution, price improvement opportunities (executions at prices superior to the then prevailing inside market), automatic execution guarantees, the availability of efficient and reliable order handling systems, the level of service provided, the cost of executing orders, whether it will receive cash or non-cash payments for routing order flow and reciprocal business arrangements.* E\*TRADE regularly and rigorously reviews its order-routing practices and the execution quality obtained from market centers to which it routes orders.

SAC ¶ 51 (emphasis added); <u>see also</u> SAC ¶ 52. Although E\*TRADE discloses that it will consider a list of factors --- including the receipt of PFOF and reciprocal business arrangements --- in making its order routing determinations, the SAC alleges that the list is false and misleading because E\*TRADE actually prioritizes those two factors to the exclusion of the rest. The SAC chronicles other alleged misrepresentations on E\*TRADE's website related to "The E\*TRADE Best Execution Advantage." SAC ¶ 48; <u>see also, e.g.</u>, SAC ¶ 49. Similarly, on earnings calls, Idzik emphasized "[E\*TRADE's] focus on delivering the best possible execution," SAC ¶ 56, and the company's rigorous and regular review of data to ensure best execution adherence, SAC ¶ 55.

The SAC alleges that statements in the 2013 and 2014 annual reports, and by Audette, that E\*TRADE agreed under the G1X Agreement to route order flow to G1X "subject to best execution

13

standards," SAC ¶¶ 53-54, are false because the Agreement is not actually subject to best execution standards. The SAC also faults as misleading statements in those annual reports that E*TRADE has an Order Routing and Best Execution Committee ("ORBEC") that is "responsible for evaluating [E*TRADE's] execution statistics and order-routing determinations for stock and listed options and determining how, if at all, [E*TRADE] will alter its order-routing methodology to improve execution quality," and that "also reviews order flow rates and payments received from [G1X] and other unaffiliated market centers for comparable order flow directed to them." SAC ¶ 50.

The plaintiff is a resident of California who has been a client of E*TRADE throughout the Class Period. SAC ¶ 20. The plaintiff alleges that, during the Class Period, he placed non-directed orders with E*TRADE that received worse prices than what he would have received had E*TRADE adhered to its best execution promises. SAC ¶¶ 20, 149-73.

The SAC alleges that E*TRADE has generated hundreds of millions of dollars by preferring PFOF in dereliction of its best execution promises. SAC ¶¶ 10, 86.

The defendants have moved to dismiss the 10(b) and 10b-5 claims for failure to plead reliance or scienter.[6]

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5, the plaintiff must allege that the defendants, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendants' action caused injury to the plaintiffs. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 10 (S.D.N.Y. 2016).

**A.**

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of

---

[6] In light of the disposition of this opinion, it is unnecessary to reach the defendants' alternative arguments for dismissal related to the timeliness of the claims and the falsity of the alleged misrepresentations.

action." _Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc._, 552 U.S. 148, 159 (2008).

The plaintiff argues that he should be allowed to rely on the _Affiliated Ute_ presumption of reliance under which "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance."[7] _Id._ (citing _Affiliated Ute Citizens of Utah v. United States_, 406 U.S. 128, 153-54 (1972)). Under the _Affiliated Ute_ presumption, for claims "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." _Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc._, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (quoting _Affiliated Ute_, 406 U.S. at 153).

"The claims here, however, are not 'primarily' omission claims." _Id._ The court in _Crago v. Charles Schwab & Co._, No. 16-CV-03938 (RS), 2017 WL 2540577, at *8 (N.D. Cal. June 12, 2017), recently addressed similar claims against the retail broker-dealer Charles Schwab & Co., Inc. ("Charles Schwab"), and concluded that the _Affiliated Ute_ presumption was inapplicable to those claims because they were based on misrepresentations,

---

[7] The plaintiff does not attempt to plead the fraud-on-the-market presumption identified in _Basic Inc. v. Levinson_, 485 U.S. 224 (1988). _See also_ _Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc._, 259 F.3d 154, 175 (3d Cir. 2001), _as amended_ (Oct. 16, 2001); _Last Atlantis Capital LLC v. Chicago Bd. Options Exch., Inc._, 455 F. Supp. 2d 788, 800-01 & n.16 (N.D. Ill. 2006).

not omissions. <u>Crago</u> is persuasive on this point. The gravamen of the plaintiff's claims in this case is that the defendants disclosed that E*TRADE considered PFOF and reciprocal business arrangements in making order routing determinations, but that the disclosures made it seem like those were only two factors among many, not the decisive factors that compromised the best execution promises. The plaintiff claims that the defendants' best execution representations were false because E*TRADE's routing decisions were, in fact, *not* subject to best execution. While the plaintiff argues that the purported misrepresentations should be construed as omissions, the "alleged omissions . . . are simply the flip side of the affirmative misstatements," which is insufficient to invoke <u>Affiliated Ute</u>. <u>Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.</u>, No. 05 CIV. 1898 (SAS), 2006 WL 2161887, at *9 (S.D.N.Y. Aug. 1, 2006), <u>aff'd</u>, 546 F.3d 196 (2d Cir. 2008); <u>see also, e.g.</u>, <u>In re Barclays Liquidity Cross & High Frequency Trading Litig.</u>, 126 F. Supp. 3d 342, 365-66 (S.D.N.Y. 2015); <u>Carpenters Pension Trust Fund of St. Louis v. Barclays PLC</u>, 310 F.R.D. 69, 98 (S.D.N.Y. 2015).

Moreover, the plaintiff has failed to detail any omissions in the SAC. The plaintiff therefore cannot rely on any omissions because they are not alleged with particularity. <u>See, e.g.</u>, <u>In re Harbinger Capital Partners Funds Inv'r Litig.</u>, No. 12-CV-1244

(AJN), 2015 WL 1439520, at *13 (S.D.N.Y. Mar. 30, 2015);

Morrison v. Hoffmann-La Roche, Inc., No. 14-cv-4476 (DLI), 2016

WL 5678546, at *9 (E.D.N.Y. Sept. 29, 2016). The allegations are

clear that this is primarily an affirmative misrepresentation

case to which the Affiliated Ute presumption is inapplicable.

See, e.g., SAC ¶¶ 1, 5, 11, 89. The plaintiff's opposition

papers are similarly clear that the plaintiff himself conceives

of this case as one about affirmative misrepresentations: the

plaintiff argues that he "relied on Defendants'

misrepresentations to provide best execution when deciding to

use E*TRADE to execute his securities trades." Pl.'s Mem. Op. at

1; see also Pl.'s Mem. Op. at 2-4.

The cases cited by the plaintiff for the proposition that

reliance can be presumed where a company is "silent" about its

"illegal activity," see, e.g., In re Initial Pub. Offering Sec.

Litig., 241 F. Supp. 2d 281, 382 (S.D.N.Y. 2003), are

inapplicable because the defendants were not silent about their

best execution obligations. To the contrary, under the

plaintiff's theory, the defendants were quite noisy about those

obligations. The best execution representations were ubiquitous.

See Crago, 2017 WL 2540577, at *8 ("This is not a case in which

a lack of positive statements necessitates a presumption of

reliance; plaintiffs identify multiple alleged

misrepresentations.").

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154 (3d Cir. 2001), does not aid the plaintiff because that case involved allegations of reliance on an "implied representation of the duty of best execution," in other words, an omission. Id. at 173. The case involved "material nondisclosure." Id. Here, the plaintiff does not allege that he relied on any implied representation, but instead that he relied upon affirmative misrepresentations.

The plaintiff also places great weight on the allegation that E*TRADE's practice is "uniform" with respect to its clients, SAC ¶ 61, but that does not alter the fact that this case involves primarily misrepresentations.

Without a presumption of reliance, the plaintiff must allege reasonable reliance on the alleged misrepresentations. That pleading bar "only requires allegations that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" ATSI, 493 F.3d at 106 (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)); see also Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011) ("[A] plaintiff can demonstrate reliance . . . by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation.").

Amazingly, the plaintiff fails to clear that threshold. The plaintiff's allegations of detrimental reliance are entirely conclusory, see SAC ¶¶ 14, 62, 192, and fail to show with any sort of particularity that the plaintiff was aware --- whether by reading, hearing, or otherwise --- of any of the challenged misstatements when he traded with E*TRADE. See Crago, 2017 WL 2540577, at *7 (rejecting conclusory allegations as insufficient to plead reliance); Last Atlantis Capital LLC v. Chicago Bd. Options Exch., Inc., 455 F. Supp. 2d 788, 799-801 & nn.13-15 (N.D. Ill. 2006) (dismissing claims based on alleged misstatements by exchange-defendants with respect to order execution because "[p]laintiffs do not allege that any plaintiff, let alone all of the plaintiffs, read these statements and were misled by them"); cf. In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 477 (S.D.N.Y. 2012), aff'd, 525 F. App'x 16 (2d Cir. 2013) (summary order). The plaintiff's allegation that he "would" have used another broker had he known that E*TRADE was not delivering best execution is insufficient to establish awareness of a specific misrepresentation. See In re Lehman Bros. Sec. & ERISA Litig., No. 09 MD 2017 (LAK), 2013 WL 5730020, at *1, *4 (S.D.N.Y. Oct. 22, 2013).

The cases cited by the plaintiff do not suggest a different result. Zola v. TD Ameritrade, Inc., 172 F. Supp. 3d 1055, 1064-67 (D. Neb. 2016), allowed similar securities fraud claims to

proceed against the retail-broker dealer TD Ameritrade. But Zola did not address whether the plaintiff there had pleaded reliance, and thus does not aid the plaintiff here. Pearce v. UBS PaineWebber, Inc., No. 3:02-2409-17, 2003 WL 25518056, at *1-2, *12 (D.S.C. Nov. 4, 2003), involved allegations of a direct misrepresentation by the defendant-broker to the plaintiff on which the plaintiff relied. In re UBS Auction Rate Sec. Litig., No. 08-cv-2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010), is not analogous because that case involved claims of market manipulation that required only allegations of "reliance on an assumption of an efficient market free of manipulation." Id. at *22 (citations omitted); see also id. at *24. In re Smith Barney Transfer Agent Litig., 290 F.R.D. 42 (S.D.N.Y. 2013), is likewise distinguishable because that case involved disclosures that the court found to be truthful. The court found that the plaintiffs' claims "involve[d] primarily a failure to disclose." Id. at 48 (citing Affiliate Ute, 406 U.S. at 153). In this case, the plaintiff relies throughout the SAC on alleged misrepresentations.

Therefore, the plaintiff's claim in Count One for a violation of Section 10(b) and Rule 10b-5 must be **dismissed without prejudice** for failure to plead reliance. However, it is plain that the plaintiff's reliance on any purported misrepresentations could not be justified after he filed this

21

action on July 22, 2016. Any claims based on trades that occurred after that date are accordingly **dismissed with prejudice**.

### B.

The allegations are also insufficient to establish that the corporate defendants acted with corporate scienter.

The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1467 (2d Cir. 1996) (citations omitted). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." <u>ATSI</u>, 493 F.3d at 99.

In order to plead scienter adequately, the plaintiff must allege facts supporting a strong inference with respect to each defendant. <u>See</u> <u>Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.</u>, 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must

take into account plausible opposing inferences." <u>Tellabs, Inc.</u>
<u>v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 323 (2007). A
complaint sufficiently alleges scienter when "a reasonable
person would deem the inference of scienter cogent and at least
as compelling as any opposing inference one could draw from the
facts alleged." <u>Id.</u> at 324; <u>see also</u> <u>Slayton v. Am. Express Co.</u>,
604 F.3d 758, 766 (2d Cir. 2010).

To raise a strong inference of scienter through motive and
opportunity to defraud, a plaintiff must allege that the
defendants "'benefitted in some concrete and personal way from
the purported fraud.'" <u>ECA, Local 134 IBEW Joint Pension Trust</u>
<u>of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir.
2009) (quoting <u>Novak v. Kasaks</u>, 216 F.3d 300, 307–08 (2d Cir.
2000)). "Motives that are common to most corporate officers,
such as the desire for the corporation to appear profitable and
the desire to keep stock prices high to increase officer
compensation, do not constitute 'motive' for purposes of this
inquiry." <u>Id.</u> Motive is generally shown by alleging that
corporate insiders made the misrepresentation in order to sell
their own shares at a profit. <u>Id.</u>

Where the defendants' motive to commit fraud is not
apparent, "the strength of the circumstantial allegations [that
a defendant consciously or recklessly misbehaved] must be
correspondingly greater." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 142

(2d Cir. 2001) (citation and internal quotation marks omitted). Plaintiffs typically allege conscious or reckless misbehavior by pleading with specificity that the defendants had "knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308. As the Court of Appeals for the Second Circuit has explained, "[r]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (alterations in original) (citation and internal quotation marks omitted); see also In re Lions Gate, 165 F. Supp. 3d at 22–23.

"When the defendant is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). "[I]t is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading."

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797
F.3d 160, 177 (2d Cir. 2015) (citation omitted); see also Lipow
v. Netl UEPS Techs., Inc., 131 F. Supp. 3d 144, 160 (S.D.N.Y.
2015).

The plaintiff attempts to impute scienter to the corporate
defendants by alleging that Idzik and Roessner acted with
scienter, or, in the alternative, that unidentified individuals
within the corporate defendants acted with scienter.

Taken as a whole, the allegations of scienter fall short
with respect to the individual defendants.

Beginning with Idzik, the plaintiff makes no effort to
plead that he had a motive to make false best execution
promises, and the allegations of reckless misbehavior are
insufficient. Missing from the case is the connective tissue
that could link Idzik to any information that would lead to a
compelling and cogent inference of scienter.

The plaintiff rests his claims on the theory that Idzik
must have known that the best execution promises were going
unfulfilled, or at least had access to best execution data that
would reveal that fact, by virtue of his position as CEO, but
"boilerplate allegations that defendants knew or should have
known of fraudulent conduct based solely on their board
membership or executive positions are insufficient to plead
scienter." *In re Sotheby's Holdings, Inc. Secs. Litig.*, No. 00

CIV. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000); see also Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011).

The arguments that Idzik failed to monitor E*TRADE's trading algorithms, "the terms of the G1X Agreement" (presumably in so far as they could conflict with the best execution representations), and execution quality, Pl.'s Mem. Op. at 18, suffer from the same flaw. There is no allegation about Idzik's role in monitoring any of these items (let alone that he acted recklessly in fulfilling any such duty) beyond the allegation that he was CEO. See Fogel v. Wal-Mart de Mexico SAB de CV, No. 13 CIV. 2282 (KPF), 2017 WL 751155, at *16 (S.D.N.Y. Feb. 27, 2017) (declining the plaintiff's invitation to speculate that subordinates must have conveyed contrary information to a defendant because the defendant was a high ranking officer); Crago, 2017 WL 2540577, at *5. Indeed, the plaintiff alleges that ORBEC was responsible for monitoring best execution, but does not allege that Idzik served on ORBEC or any other committee responsible for evaluating best execution.

There is similarly no allegation from which to infer that Idzik had any reason to believe that ORBEC was not regularly and rigorously reviewing order flow data to ensure that E*TRADE was complying with its best execution representations. While the SAC notes that Griffin instigated the 2012 internal review, the

26

plaintiff does not raise that issue in his briefing. Moreover, the allegations regarding improper practices by E*TRADE occurred before Idzik's arrival as CEO in January 2013, and there is no allegation from which to conclude that Idzik did not believe that the issues that concerned Griffin with respect to execution quality had been solved by the "additions and changes" to E*TRADE's "standards, processes and procedures for measuring execution quality," as disclosed in the 2012 Form 10-K. There is no allegation from which to infer that Griffin's subsequent resignation from the Board of Directors in March 2013 was "noisy" in that it was designed to alert an executive like Idzik that execution quality issues remained outstanding.

For the same reason, the FINRA Censure and Fine of E*TRADE for events that occurred from July 2011 to June 2012 cannot be used to attribute scienter to Idzik. The fact that the alleged misconduct with respect to best execution predates Idzik's arrival as CEO (indeed, much of the misconduct is alleged to predate the Class Period) further undermines any inference of culpability as to Idzik. See Shemian v. Research In Motion Ltd., No. 11 CIV. 4068 (RJS), 2013 WL 1285779, at *16 (S.D.N.Y. Mar. 29, 2013), aff'd, 570 F. App'x 32 (2d Cir. 2014) (summary order).

Similarly, regulatory statements and notices highlighting generic concerns that a broker-dealer's receipt of PFOF *may* be

inconsistent with best execution do not support the leap that
Idzik must have been aware that E*TRADE's treatment of PFOF *was*
inconsistent with its best execution obligations. See Gurfein v.
Ameritrade, Inc., 411 F. Supp. 2d 416, 426 (S.D.N.Y. 2006); Last
Atlantis, 455 F. Supp. 2d at 795. The same is true for any
regulatory actions against E*TRADE or G1X that dealt with
subject matters unrelated to best execution.

The plaintiff argues that third-party studies at least
alerted Idzik to the obvious danger that E*TRADE was not
complying with best execution standards. A plaintiff may
establish scienter by "specifically identify[ing] the reports or
statements that are contradictory to the statements made
. . . ." Glaser, 772 F. Supp. 2d at 588 (citations omitted). The
flaw in the plaintiff's allegations is that there is nothing
particularized to link Idzik to any such report. There is no
allegation that Idzik actually reviewed, for example, the
Battalio Report, or, if he did, what actions he took in response
that would evidence reckless disregard. See, e.g., Pearlstein v.
BlackBerry Ltd., 93 F. Supp. 3d 233, 246 (S.D.N.Y. 2015), aff'd
sub nom. Cox v. Blackberry Ltd., 660 F. App'x 23 (2d Cir. 2016)
(summary order); In re Cross Media Mktg. Corp. Sec. Litig., 314
F. Supp. 2d 256, 264 (S.D.N.Y. 2004). There is no internal or
external report cited or other particularized allegation to
suggest that Idzik knew at any point that E*TRADE was delivering

something less than best execution. See In re Citigroup Inc.
S'holder Derivative Litig., No. 07 CIV. 9841, 2009 WL 2610746,
at *10 (S.D.N.Y. Aug. 25, 2009).

The plaintiff argues that scienter may be inferred under
the "core operations" doctrine. See, e.g., In re Atlas Air
Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489
(S.D.N.Y. 2004) ("[I]f a plaintiff can plead that a defendant
made false or misleading statements when contradictory facts of
critical importance to the company either were apparent, or
should have been apparent, an inference arises that high-level
officers and directors had knowledge of those facts by virtue of
their positions with the company."). Whether a plaintiff may
rely on the core operations doctrine in light of the PSLRA has
not been decided by the Court of Appeals for the Second Circuit.
See Frederick v. Mechel OAO, 475 F. App'x 353, 356 & n.5 (2d
Cir. 2012) (summary order). "However, the Second Circuit [has]
commented that the doctrine can 'provide supplemental support
for allegations of scienter, even if [it] cannot establish
scienter independently.'" In re Pretium Res. Inc. Sec. Litig.,
No. 13-CV-7552 (VSB), 2017 WL 2560005, at *7 (S.D.N.Y. June 13,
2017) (quoting New Orleans Emps. Ret. Sys. v. Celestica, Inc.,
455 F. App'x 10, 14 n.3 (2d Cir. 2011) (summary order)). While
courts in the Second Circuit have questioned the continuing
viability of the doctrine, the majority "consider the 'core

operations' allegations to constitute supplementary, but not an independent, means to plead scienter." Id. (citations omitted).

Applying the majority approach, and treating the core operations allegations as supplemental, the alleged regulatory and business importance of E*TRADE's non-directed order routing business is insufficient to make the inference of scienter at least as compelling as any nonculpable inference. The importance of best execution should have heightened Idzik's awareness to any information that would show him that E*TRADE was failing to deliver on that promise. However, the import of the alleged misrepresentations cannot substitute for allegations linking Idzik to information that would alert him that E*TRADE was delivering something less than best execution.[8] See id. at *13; Pearlstein, 93 F. Supp. 3d at 247; Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011).

Considering the SAC holistically, the allegations are insufficient to establish that Idzik acted with scienter.

Moreover, considering the SAC holistically, the scienter allegations against Roessner are plainly insufficient. There are no particularized allegations against Roessner other than that he was the General Counsel and an Executive Vice President of

---

[8] While the plaintiff relies on the finding of scienter against the CEO in Zola, 172 F. Supp. 3d at 1074, that finding was apparently based on the application of the "core operations" doctrine, and it is unclear what other pleading supported the finding of scienter in that case.

E*TRADE from 2009 until he became the CEO of E*TRADE Financial in September 2016. The plaintiff cannot allege scienter by merely pointing to Roessner's job title. In addition, the plaintiff's allegations against Roessner appear to be primarily predicated on the fact that Roessner was a CEO. However, it follows from the dismissal of any claims based on trades that occurred on or after July 22, 2016 that Roessner's service as a CEO is irrelevant to the scienter analysis. Roessner, as a General Counsel and Executive Vice President, stands in the same position as any other unidentified employee within the corporate defendants who does not necessarily have ultimate authority over what the corporate defendants said. See In re Pfizer Inc. Sec. Litig., 819 F.3d 642, 656 (2d Cir. 2016) ("[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." (citation and internal quotation marks omitted)). Without any allegations to connect him to any wrongdoing, the plaintiff cannot plausibly ascribe scienter to Roessner, let alone impute his intent to the corporate defendants. See Silvercreek Mgmt., Inc. v. Citigroup, Inc., No. 02-CV-8881 (JPO), 2017 WL 1207836, at *8 (S.D.N.Y. Mar. 31, 2017) ("[The plaintiff] does not sufficiently connect any of these individuals to *both* knowledge of Enron's wrongdoing and the dissemination of the misstatements at issue.").

Finally, the plaintiff claims that he can establish scienter against the corporate defendants based on the scienter of unidentified individuals within the corporate defendants. In doing so, the plaintiff eschews any theory that such individuals acted recklessly, instead arguing that the individuals had a motive to misrepresent best execution adherence, namely, the pursuit of millions in PFOF on behalf of the corporate defendants. While a plaintiff is not required to identify specifically the individuals at a company who acted with scienter in order to plead scienter with respect to a company, see Solow v. Citigroup, Inc., 827 F. Supp. 2d 280, 291 (S.D.N.Y. 2011) (collecting cases), the allegations must still establish that *someone* whose intent could be imputed to the corporate defendants acted with scienter. See Silvercreek Mgmt., 2017 WL 1207836, at *6-7; see also In re Marsh & McLennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants."). The pursuit of PFOF is the type of generic profit motive that is insufficient to establish scienter. See, e.g., Oughtred v. E*Trade Fin. Corp., No. 08 CIV. 3295 (SHS), 2011 WL 1210198, at *7 (S.D.N.Y. Mar. 31, 2011); Last Atlantis, 455 F. Supp. 2d at 794 (finding no scienter where

"[p]laintiffs' allegations describe a situation in which a specialist would have a financial motive and the opportunity to mishandle plaintiffs' orders in order to trade from their own proprietary accounts").[9]

The plaintiff has therefore failed to allege plausibly that any agent of the corporate defendants had a culpable motive that could be imputed to the corporate defendants. In sum, Count One must also be **dismissed without prejudice** for failure to plead scienter.

## IV.

The plaintiff alleges that the individual defendants are liable under Section 20(a) of the Exchange Act because they controlled the corporate defendants, which in turn violated Section 10(b) and Rule 10b-5. Section 20(a) provides:

> Every person who, directly, or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

---

[9] Zola, 172 F. Supp. 3d at 1074, found that corporate scienter was adequately pleaded against TD Ameritrade, but is distinguishable because (among other reasons) the court also found that the allegations of scienter were sufficient to state a claim against the company's CEO.

33

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108; see also In re Lions Gate, 165 F. Supp. 3d at 25. In this case, the plaintiff has not alleged a primary violation of Section 10(b) and Rule 10b-5.

In addition, the plaintiff has failed to allege culpable participation on the part of the individual defendants. Although "[t]he Second Circuit has not defined what is meant by the requirement that a controlling entity be a 'culpable participant,'" Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC, 592 F. Supp. 2d 608, 635 n.192 (S.D.N.Y. 2009), culpable participation at a minimum "requires 'something more than negligence,'" In re Alstom SA Secs. Litig., 406 F. Supp. 2d 433, 490 (S.D.N.Y. 2005) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 209 n.28 (1976)). Among the district courts within the Second Circuit, "[t]he weight of well-reasoned authority is that to withstand a motion to dismiss a section 20(a) controlling person liability claim, a plaintiff must allege some level of culpable participation at least approximating recklessness in the section 10(b) context." Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210,

231 (S.D.N.Y. 2008) (internal quotation marks omitted); see also
Arbitron, 741 F. Supp. at 491–92; accord In re ShengdaTech, Inc.
Sec. Litig., No. 11 CIV. 1918 (LGS), 2014 WL 3928606, at *10 &
n.1 (S.D.N.Y. Aug. 12, 2014) (collecting cases). The plaintiff
has not made this showing with respect to either individual
defendant.

Accordingly, Count Two must also be **dismissed without
prejudice**.

### V.

The plaintiff has asked for leave to replead in the event
the SAC is found deficient. Rule 15(a) provides that leave to
file an amended complaint should be granted "freely . . . when
justice so requires." Fed. R. Civ. P. 15(a)(2); see also Foman
v. Davis, 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that
leave to amend 'shall be freely given when justice so requires';
this mandate is to be heeded." (citation omitted)). That request
is **granted** because the plaintiff may be able to cure the
pleading deficiencies in the SAC and it cannot be said that
amendment would be futile. See Loreley Fin, 797 F.3d at 189–91;
Crago, 2017 WL 2540577, at *8 (granting leave to replead).

### Conclusion

The Court has considered all of the remaining arguments of
the parties. To the extent not specifically addressed above,
they are either moot or without merit. For the foregoing

reasons, the defendants' motion to dismiss is **granted and the SAC is dismissed without prejudice** with respect to any claims arising before the date this action was filed on July 22, 2016. The plaintiff may file a third amended complaint within thirty (30) days of the filing of this Opinion and Order.

The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:     **New York, New York**
           **July 10, 2017**          _____/s/_____
                                         **John G. Koeltl**
                                 **United States District Judge**