UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CRAIG L. SCHWAB, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

16-cv-05891 (JGK)

Plaintiff,

OPINION AND ORDER

- against -

E*TRADE FINANCIAL CORPORATION ET AL,

Defendants.

**JOHN G. KOELTL, District Judge:**

The lead plaintiff, Craig L. Schwab, brought this case on behalf of a proposed class of clients of E*TRADE Securities LLC ("E*TRADE") who placed securities trade orders with E*TRADE between July 12, 2011 and July 22, 2016 (the "Class Period"). In Count I, the plaintiff asserts violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against E*TRADE and E*TRADE Financial Corporation ("E*TRADE Financial"), E*TRADE's parent corporation (collectively, the "corporate defendants"). In Count II, the plaintiff asserts control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Paul T. Idzik and Karl A. Roessner (collectively, the "individual defendants"). Idzik is a former director and Chief Executive Officer of E*TRADE Financial, and Roessner is the former General

1

Counsel and a current director and Chief Executive Officer of E*TRADE Financial.

In a Memorandum Order and Opinion dated April 3, 2017, this Court dismissed common law claims against E*TRADE and E*TRADE Financial that arose out of the same conduct at issue here because those claims were precluded by the Securities Litigation Uniform Standards Act (the "SLUSA"). See Rayner v. E*TRADE Fin. Corp., 248 F. Supp. 3d 497, 506 (S.D.N.Y. 2017), appeal docketed, No. 17-1487 (2d Cir. May 8, 2017) ("E*TRADE I"). In an Opinion dated July 10, 2017, this Court dismissed the Second Amended Complaint (the "SAC") in this action without prejudice for failure to plead adequately the reliance and scienter elements of the plaintiff's Section 10(b) and Rule 10b-5 claim, upon which the plaintiff's claim for control person liability was premised. See Schwab v. E*TRADE Fin. Corp., 258 F. Supp. 3d 418 (S.D.N.Y. 2017) ("E*TRADE II"). Familiarity with those decisions and the underlying facts of the case are presumed.

On August 9, 2017, the plaintiff filed the Third Amended Complaint (the "TAC"), the plaintiff's fourth pleading in this case. The defendants have moved to dismiss the TAC for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

For the following reasons, the motion is **granted**.

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should not be dismissed if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While factual allegations should be construed in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Securities Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private

Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure

4

documents required by law." Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see also In re Eletrobras Sec. Litig., No. 15-cv-5754 (JGK), 2017 WL 1157138, at *1-2 (S.D.N.Y. Mar. 27, 2017).

## II.

The following facts are undisputed or accepted as true for purposes of the defendants' motion to dismiss. Facts are repeated from E*TRADE II only as necessary.

E*TRADE Financial is a Delaware corporation, with its principal place of business in New York City, that provides brokerage and related services primarily to individual retail investors. TAC ¶ 18. E*TRADE is a Delaware limited liability company that is a wholly-owned subsidiary of E*TRADE Financial.[1] Id. ¶ 19. E*TRADE is a broker-dealer registered with the United States Securities and Exchange Commission (the "SEC"), and is the primary provider of brokerage products and services to E*TRADE Financial's customers. Id.

Idzik was the CEO and a director of E*TRADE Financial from January 22, 2013 until his departure on September 12, 2016. Id. ¶ 20.

---

[1] The TAC alleges that "E*TRADE Financial is liable for all statements made by E*TRADE because E*TRADE['s] statements at all relevant times were attributable to, controlled by, and authored by E*TRADE Financial," TAC ¶ 67, which the defendants do not dispute.

From May 2009 to September 12, 2016, Roessner served as the Executive Vice President and General Counsel of E*TRADE. Id. ¶ 21. On September 12, 2016, Roessner became the CEO and a director of E*TRADE Financial, and the President of E*TRADE Bank, a subsidiary of E*TRADE Financial. Id. ¶¶ 19, 21.

Brokers, such as E*TRADE, can route orders for execution to third-party venues, such as exchanges and market makers. Id. ¶¶ 22, 24. A "non-directed order" is a standard type of order that a client can place with E*TRADE where E*TRADE (as opposed to the client) chooses the trading venue for the order. Id. ¶ 24. The TAC alleges that "over 95 percent of orders placed with E*TRADE are non-directed." Id.

E*TRADE generates revenue from both the commissions that its customers pay in exchange for routing orders and from the payments for order flow ("Payments for Order Flow" or "PFOF") that it receives from venues under the "maker-taker" model. Id. ¶¶ 7, 34. Under the maker-taker model, venues pay brokerage firms for "making" a market or adding liquidity for certain types of orders, while venues charge brokers an access or "take" fee for matching a marketable order with an existing bid or offer. Id. ¶ 30.

The maker-taker model, including the receipt of PFOF, is heavily regulated by the federal securities regime. See, e.g., Regulation NMS, Exchange Act Release No. 34-51808, 2005 WL

6

1364545 (June 9, 2005); see also E*TRADE I, 248 F. Supp. 3d at

501. There is no allegation that the receipt of PFOF is

inherently wrongful; indeed, the SEC permits broker-dealers to

receive PFOF subject to certain disclosure requirements. 17

C.F.R. § 240.10b-10(a)(2)(i)(C); see also Exchange Act Rule 606,

17 C.F.R. § 242.606 (requiring the disclosure of quarterly

reports related to the receipt of PFOF).

E*TRADE has a duty of best execution, which, among other

things, requires it to "use reasonable diligence to ascertain

the best market for the subject security and buy or sell in such

market so that the resultant price to the customer is as

favorable as possible under prevailing market conditions."

Financial Industry Regulatory Authority ("FINRA") Rule

5310(a)(1)[2]; see also TAC ¶¶ 39-48. In its Customer Agreement,

E*TRADE purports to take a number of factors into consideration

in determining where to rout customers' orders, including:

> the speed of execution, price improvement
> opportunities (executions at prices superior to the
> then prevailing inside market), automatic execution
> guarantees, the availability of efficient and reliable
> order handling systems, the level of service provided,
> the cost of executing orders, whether it will receive
> cash or non-cash payments for routing order flow and
> reciprocal business arrangements.

Id. ¶ 52.

---

[2] FINRA Rule 5310 superseded NASD Rule 2320 on May 31, 2012, and
incorporates NASD Rule 2320's provisions concerning a broker-
dealer's duty of best execution. See TAC ¶ 44.

The gist of the allegations in the TAC is that despite E*TRADE's assurances that it will execute orders consistent with its duty of best execution, E*TRADE actually considers just two factors -- E*TRADE's order-handling agreement with G1 Execution Services, LLC ("G1X") and the maximization of PFOF -- when routing customers' orders, to the exclusion of the other factors relevant to best execution.[3] See TAC ¶¶ 5-7, 11, 58, 71, 98, 154.

Acquired in 2001, G1X was a subsidiary of E*TRADE Financial until February 2014, when E*TRADE Financial sold G1X to Susquehanna International Group LLP. Id. ¶¶ 72, 82. The plaintiff alleges that under an "order flow agreement" between E*TRADE and G1X (the "G1X Agreement") entered into in connection with the sale of G1X, E*TRADE agreed to route up to 70% of its orders to G1X in exchange for PFOF, "subject to best execution standards." See id. ¶¶ 6, 54-55, 69, 71, 82, 92. On earnings calls, Idzik allegedly emphasized "[E*TRADE's] focus on delivering the best possible execution," Id. ¶ 57, and E*TRADE's Customer Agreement touted the company's rigorous and regular review of data to ensure best execution, Id. ¶ 52. However, the plaintiff alleges that E*TRADE's routing strategy results in the delivery of something less than best execution and thus less advantageous prices for its clients. See id. ¶¶ 5-7, 10, 92, 98.

---

[3] G1X was named "E*TRADE Capital Markets, LLC" before February 2014. See TAC ¶ 72.

The plaintiff is a resident of California who has been a client of E*TRADE throughout the Class Period. Id. ¶ 17. The plaintiff alleges that, during the Class Period, he placed non-directed orders with E*TRADE that received more unfavorable routing treatment than what he would have received had E*TRADE adhered to its best execution promises. Id. ¶¶ 158–82.

### III.

The defendants have again moved to dismiss the 10(b) and 10b-5 claim (Count I) for failure to plead reliance or scienter.[4] The Court dismissed the SAC on those grounds, and the TAC also fails to plead these elements sufficiently.

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. To state a claim under Rule 10b-5, the plaintiff must allege that, in connection with the purchase or sale of a security, the defendants made a materially false statement or omitted a material fact, with scienter, and that

---

[4] In light of the disposition in this Opinion and Order, it is unnecessary to reach the defendants' alternative arguments for dismissal related to the falsity of the alleged misrepresentations.

the plaintiff's reliance on the defendants' action caused injury to the plaintiff. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 10 (S.D.N.Y. 2016).

## A.

The plaintiff has again failed to plead that he relied on the defendants' alleged misrepresentations in routing his transactions through E*TRADE. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc., 552 U.S. 148, 159 (2008). "This is because proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011) (quoting Basic v. Levinson, 485 U.S. 224, 243 (1988)). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction -- e.g., purchasing common stock—based on that specific misrepresentation." Id. at 810; see also Waggoner v. Barclays PLC, 875 F.3d 79, 93 (2d Cir. 2017). Because the plaintiff has again failed to allege that he actually read, or was otherwise aware of, E*TRADE's representations regarding its

best execution methodology, the plaintiff cannot make the "traditional" showing.[5]

In certain situations, a plaintiff may also benefit from a rebuttable presumption of reliance -- the "Basic" or "fraud-on-the-market" presumption -- where the plaintiff transacted in the stock of a company that made material misrepresentations to the public and whose stock is traded on an efficient market. See Basic, 485 U.S. at 250; see also Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2408 (2014). However, the plaintiff does not allege that E*TRADE's misrepresentations affected the market price of the securities the plaintiff traded, but rather that E*TRADE mishandled the plaintiff's trades. The Basic presumption therefore does not apply, and the plaintiff does not argue that it should.

Rather than demonstrating actual reliance or seeking the Basic presumption, the plaintiff argues that he is entitled to

---

[5] As the Court explained in E*TRADE II, "[t]he plaintiff's allegations of detrimental reliance are entirely conclusory." E*TRADE II, 258 F. Supp. 3d at 430. The plaintiff confirmed at oral argument that, in opposition to the present motion, the plaintiff does not rely on the "traditional (and most direct)" means of showing reliance -- namely actual awareness of the alleged misrepresentations. See Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc., No. 16-250, 2018 WL 385215, at *6 (2d Cir. Jan. 12, 2018) (explaining that where a purported class alleges actual reliance on the defendant's misrepresentation, it "dooms the predominance of class-wide issues under [Federal Rule of Civil Procedure] 23(b)(3) and defeats class certification").

the Affiliated Ute presumption of reliance, under which "if
there is an omission of a material fact by one with a duty to
disclose, the investor to whom the duty was owed need not
provide specific proof of reliance." Stoneridge Inv. Partners,
LLC, 552 U.S. at 159 (citing Affiliated Ute Citizens of Utah v.
United States, 406 U.S. 128, 153-54 (1972)). This Court
previously rejected the plaintiff's argument that he is entitled
to rely on the Affiliated Ute presumption of reliance because
the plaintiff's allegations were primarily misrepresentation
claims rather than omission claims.

Attempting to cure the SAC's deficiencies, the TAC repeats
the plaintiff's allegations that E*TRADE made "repeated promises
and assurances" that it was properly considering the multiple
factors relevant to best execution in a balanced way. TAC ¶¶ 11,
71. But the TAC adds the supplemental allegation that E*TRADE
"fail[ed] to disclose its actual order routing practices." See,
e.g., TAC ¶ 11. However, the "omission" to reveal the falsity of
E*TRADE's "promises and assurances" about its best execution
methodology is simply the flip side of those positive
statements. The failure to disclose the alleged falsity of a
representation does not transform a misrepresentation case into
an omission case and allow a plaintiff to seek refuge in the
Affiliated Ute presumption.

The plaintiff previously cited Strougo v. Barclays PLC, 312 F.R.D. 307 (S.D.N.Y. 2016), aff'd sub nom. Waggoner v. Barclays PLC, 875 F.3d 79 (2d Cir. 2017) to support his argument that he and his purported class are entitled to the Affiliated Ute presumption of reliance. Pl.'s Mem. of Law in Opp'n. to Mot. to Dismiss the SAC (Dkt. No. 60) at 11. In Waggoner, an appeal of Strougo decided roughly four months after this Court dismissed the SAC, the Second Circuit Court of Appeals reversed the district court's application of the Affiliated Ute presumption and explained that "[t]he Affiliated Ute presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents." Waggoner, 875 F.3d at 96.[6]

The plaintiffs in Waggoner alleged that Barclays PLC and its subsidiary, Barclays Capital Inc. ("Barclays"), represented that they protected traders in Barclays' private securities trading venue, Barclays' Liquidity Cross ("LX"), from predatory high-frequency traders through "Liquidity Profiling" and other

---

[6] Because the Court of Appeals found that the plaintiffs were entitled to the Basic presumption of reliance, the Court of Appeals ultimately concluded that it was proper for the district court to find that the plaintiffs had shown reliance and ultimately affirmed the order of the district court granting the plaintiffs' motion for class certification. Waggoner, 875 F.3d at 106-107.

13

means. Id. at 88. According to the plaintiffs, Barclays did not actually employ these defensive measures, but in fact favored high-frequency traders by providing to them private information about LX that was not available to other investors. Id. In favor of the Affiliated Ute presumption, the plaintiffs argued "that Barclays failed to disclose that Liquidity Profiling did not apply to a significant portion of the trades conducted in LX." Id. at 96. However, the Court of Appeals explained that "[t]hat 'omission' is simply the inverse of the Plaintiffs' misrepresentation allegation: Barclays' statement that Liquidity Profiling protected LX traders was false." Id.

The Court of Appeals explained further that, because the "labels 'misrepresentation' and 'omission' are of little help," the applicability of the Affiliated Ute presumption turns on the underlying rationale of Affiliated Ute: where no positive statements exist, "reliance as a practical matter is impossible to prove." Id. at 95 (internal quotation marks omitted). Because the Waggoner plaintiffs alleged numerous affirmative misstatements and focused their claims on them, reliance was not impossible for them to prove. Id. at 96. The Court of Appeals therefore held that the Affiliated Ute presumption did not apply.

Likewise, in this case the plaintiff readily points to numerous affirmative representations by the defendants that the

14

defendants were complying with the duty of best execution. See, e.g., TAC at ¶¶ 5, 11, 15, 49, 60, 70. The TAC alleges that "[a]t all times, Plaintiff relied on E*TRADE's representation that it would honor its duty of best execution in the course of routing Plaintiff's trades." Id. ¶ 70; see id. ¶ 58 ("E*TRADE and E*TRADE Financial did not disclose their actual order routing policy to customers who continued to place trades in reliance on E*TRADE's promise of considering factors relevant to a proper best execution analysis."); see also id. ¶¶ 52, 57. As in Waggoner, the plaintiff's argument that "[d]isclosure of the true nature of E*TRADE's routing practices was necessary to render its promises of best execution not misleading," TAC ¶ 8, "is simply the inverse of the [plaintiff's] misrepresentation allegation." Waggoner, 875 F.3d at 96. This is not a case where the plaintiff could not prove reliance on the numerous allegedly false representations alleged by the plaintiff if there were such reliance. The Affiliated Ute presumption of reliance therefore does not apply to the plaintiff's allegations.

The plaintiff argues that a recent decision from the Northern District of California supports his reliance on the Affiliated Ute presumption. See Crago et al. v. Charles Schwab & Co., Inc. et al., 16-cv-03938 (RS) (Dkt. No. 98) (N.D. Cal. Dec. 5, 2017) ("Crago II"). The Crago II court initially dismissed the plaintiffs' complaint, which related to a broker-dealer's

allegedly false representations that it complied with its duty of best execution, in part for failure to plead reliance. See Crago v. Charles Schwab & Co., Inc., No. 16-cv-03938 (RS), 2017 WL 2540577, at *8 (N.D. Cal. June 12, 2017) ("Crago I"). The Crago II court then denied the defendant's motion to dismiss the Second Amended Complaint, finding that the plaintiffs could rely on the Affiliate Ute presumption. The Crago II court agreed with the plaintiffs that the Affiliated Ute presumption properly applied because the plaintiffs could not have known that the defendant executed trades in a way inconsistent with the defendant's duty of best execution. See Crago II, at 14.

However, the Crago II decision is not persuasive regarding the applicability of the Affiliated Ute presumption in this case. The Crago II Court simply reasoned that the distinction between omissions and misrepresentations is often "illusory," and therefore the case should proceed to discovery. Id. at 15. That conclusion is inconsistent with the guidance from the Second Circuit Court of Appeals in Waggoner, which directs that a court should analyze whether the purpose of the Affiliated Ute presumption is satisfied in an individual case. If a plaintiff pleads affirmative misrepresentations on which the plaintiff relied, then the Affiliated Ute presumption does not apply even though the plaintiff alleges that the representations were false because they omitted the truth.

The plaintiff argues that because E*TRADE allegedly withheld information showing that it did not comply with its own purported best execution practices, the plaintiff could not have known of E*TRADE's lack of compliance. But the plaintiff did not need to know the falsity of E*TRADE's claims in order to rely on them; to the contrary, reasonable reliance is usually based upon a representation believed to be true. Nothing prevented the plaintiff from alleging reliance on E*TRADE's statements that E*TRADE dutifully considered each of the relevant factors and consistently fulfilled its duty of best execution. The fact that the plaintiff apparently did not read, and was not otherwise aware of, the defendants' alleged misrepresentations does not transform this case from one about misrepresentations into one "involving primarily a failure to disclose." Affiliated Ute, 406 U.S. at 153.

Therefore, the plaintiff's claim in Count I for a violation of Section 10(b) and Rule 10b-5 is **dismissed** for failure to plead sufficiently reliance.

**B.**

The plaintiff's allegations, as revised, also fail to plead sufficiently that the corporate defendants acted with scienter.

The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of

mind." 15 U.S.C. § 78u-4(b)(2). The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (citations omitted). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).

To raise a strong inference of scienter through motive and opportunity to defraud, a plaintiff must allege that the defendants "'benefitted in some concrete and personal way from the purported fraud.'" ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (quoting Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000)). However, "[m]otives that are common to most corporate

18

officers, such as the desire for the corporation to appear
profitable and the desire to keep stock prices high to increase
officer compensation, do not constitute 'motive' for purposes of
this inquiry." Id.

Where the defendants' motive to commit fraud is not
apparent, "the strength of the circumstantial allegations [that
a defendant consciously or recklessly misbehaved] must be
correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142
(2d Cir. 2001) (internal quotation marks omitted). A plaintiff
typically alleges conscious or reckless misbehavior by pleading
with specificity that the defendants had "knowledge of facts or
access to information contradicting their public statements."
Novak, 216 F.3d at 308. As the Second Circuit Court of Appeals
has explained, "[r]eckless conduct is, at the least, conduct
which is highly unreasonable and which represents an extreme
departure from the standards of ordinary care . . . to the
extent that the danger was either known to the defendant or so
obvious that the defendant must have been aware of it." Chill v.
Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (alterations in
original) (internal quotation marks omitted); see also In re
Lions Gate, 165 F. Supp. 3d at 23.

"When the defendant is a corporate entity, . . . the
pleaded facts must create a strong inference that someone whose
intent could be imputed to the corporation acted with the

19

requisite scienter." Teamsters Local 445 Freight Div. Pension
Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008).
"[I]t is possible to plead corporate scienter by pleading facts
sufficient to create a strong inference either (1) that 'someone
whose intent could be imputed to the corporation acted with the
requisite scienter' or (2) that the statements 'would have been
approved by corporate officials sufficiently knowledgeable about
the company to know' that those statements were misleading."
Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797
F.3d 160, 177 (2d Cir. 2015); see also Lipow v. Net1 UEPS
Techs., Inc., 131 F. Supp. 3d 144, 160 (S.D.N.Y. 2015).

The Court rejected the plaintiff's previous attempt to
impute scienter to the corporate defendants by alleging that
Idzik and Roessner acted with scienter. Still "[m]issing from
the case is the connective tissue that could link Idzik to any
information that would lead to a compelling and cogent inference
of scienter." See E*TRADE II, 258 F. Supp. 3d at 432. Similarly,
the allegation of scienter with respect to Roessner is still
"plainly insufficient." See id. at 434.

The TAC does not add any allegations that raise a cogent
inference that either Idzik or Roessner acted with scienter.
Rather, the plaintiff adds further conclusory allegations that,
because of their corporate positions and experiences with past
regulatory investigations and enforcements, Idzik and Roessner

must have known of E*TRADE's failure to deliver on its promises of best execution. For example, the plaintiff adds an allegation that "Idzik and Roessner knew, by dint of their responsibilities as CEO, that E*TRADE was prioritizing receipt of order routing payments and/or reciprocal business arrangements over the considerations that are relevant to best execution determinations." TAC ¶ 60.

Likewise, the plaintiff alleges that Roessner "would have known" of E*TRADE's failure to adhere to applicable best execution regulations because, as General Counsel, Roessner had "managed the legal, compliance and regulatory functions for the Company and its bank and brokerage subsidiaries." TAC ¶ 63 (internal quotation marks omitted). But just as in E*TRADE II, "[t]he plaintiff cannot allege scienter by merely pointing to Roessner's job title." E*TRADE II, 258 F. Supp. 3d at 434–435. Still missing from the TAC are any particularized allegations against Roessner other than that he was the General Counsel and an Executive Vice President of E*TRADE from 2009 until he became the CEO of E*TRADE Financial in September 2016.

Similarly, the plaintiff's additional allegation that Idzik was a director and CEO during a period when E*TRADE Financial and Idzik acknowledged that the G1X Agreement and the company's "order handling practices and pricing for order flow" were the subject of regulatory scrutiny, TAC ¶ 66, does not lead to a

21

compelling inference that Idzik was reckless in overseeing
E*TRADE's best execution practices, or that he was aware that
E*TRADE was not complying with best execution practices. Rather,
"the plaintiff alleges that [an Order Routing and Best Execution
Committee (the "ORBEC")] was responsible for monitoring best
execution, but the plaintiff does not allege that Idzik served
on ORBEC or on any other committee responsible for evaluating
best execution." E*TRADE II, 258 F. Supp. 3d at 433; TAC ¶ 51.[7]
"[B]oilerplate allegations that defendants knew or should have
known of fraudulent conduct based solely on their board
membership or executive positions are insufficient to plead
scienter." In re Sotheby's Holdings, Inc. Secs. Litig., No. 00-
cv-1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000).

The plaintiff also attempts to concretize Idzik and
Roessner's alleged motive to commit fraud, and to impute their
alleged motivations to the corporate defendants, by including
allegations specifying that the revenue generated from PFOF
increased the bonus pool for executives. TAC ¶ 62. Similarly,
the plaintiff added an allegation that PFOF contributed to

---

[7] At oral argument of the current motion, the plaintiff argued
that the unnamed members of the ORBEC could be the corporate
agents who had scienter. But the plaintiff failed to point to
any statements by members of the ORBEC that were allegedly false
or misleading and failed to point to any materials that the
ORBEC reviewed that would have led its members to believe that
any unspecified statements that they approved were, in fact,
false or misleading.

profits per share of E*TRADE Financial's stock, a metric used to calculate Roessner's equity compensation. Id. But the fact that PFOF was a component of the company's revenue, upon which bonuses and compensation were based, does not raise a strong inference of scienter. See Kalnit, 264 F.3d at 139 ("an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers."); Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded on [the basis that an inflated stock price would increase their compensation], virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.").

Nor does the plaintiff's new allegation that "[r]outing orders is, simply, what E*TRADE does," give rise to a compelling inference of general corporate scienter. Pl.'s Mem. of Law at 23. The pursuit of PFOF is the type of generic profit motive that is insufficient to establish scienter. See, e.g., Oughtred v. E*Trade Fin. Corp., No. 08-cv-3295 (SHS), 2011 WL 1210198, at *7 (S.D.N.Y. Mar. 31, 2011); Kalnit, 264 F.3d at 139.

The plaintiff cites Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999) for the proposition that a corporate defendant's ability to profit at the expense of the

plaintiff is a sufficient allegation of motive to support a strong inference of scienter. In that case, however, where the plaintiff alleged that the defendant did not return the plaintiff's investment capital on the date promised in order to realize a profit from the "float" or use of the funds, the Second Circuit Court of Appeals described the plaintiff's allegation as "the barest of all pleading that would be acceptable." Id. Yet even those "barest of all" allegations are more specific and particularized than the plaintiff's charge in this case that the corporate defendants' scienter should be inferred simply from the fact that PFOF is a source of revenue for them.

The plaintiff has failed to allege plausibly that any agent of the corporate defendants acted with conscious or reckless misbehavior or had a sufficient motive that could be imputed to the corporate defendants. Count I is therefore **dismissed** for failure to plead scienter.

IV.

The plaintiff alleges that the individual defendants are liable under Section 20(a) of the Exchange Act because they controlled the corporate defendants, which in turn allegedly violated Section 10(b) and Rule 10b-5. Section 20(a) provides that a "controlling person" may be jointly and severally liable for violations of the Exchange Act by persons under their

control. 15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108.

The Court previously dismissed the plaintiff's Section 20(a) claim because the plaintiff failed to plead adequately a primary violation of the Exchange Act and because the plaintiff did not sufficiently allege that either Idzik or Roessner were culpable participants in any fraud. Because the plaintiff has not cured these defects, Count II is also **dismissed.**

## CONCLUSION

The Court has considered all of the remaining arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss the TAC is **granted and the TAC is dismissed.** The Clerk is directed to enter judgment dismissing the Third Amended Complaint with prejudice.

The Clerk is also directed to close all pending motions and to close this case.

**SO ORDERED.**

Dated:     **New York, New York**
             **January 20, 2018**

                                          **John G. Koeltl**
                             **United States District Judge**